# United States Court of Appeals
## For the First Circuit

Nos. 08-2175
    08-2217

UNITED STATES OF AMERICA,

Appellee,

v.

ADOLFO VERDUGO and
RAFAEL FERNÁNDEZ-ROQUE,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

---

Before

Torruella and Lipez, Circuit Judges,
and Barbadoro,[*] District Judge.

---

Tamara A. Barney, with whom B. Alan Seidler were on brief for
appellant Verdugo.
Robert C. Andrews, for appellant Fernández-Roque.
Donald C. Lockhart, Assistant United States Attorney, with
whom Luis M. Matos, Acting United States Attorney, and Mary Rogers,
Assistant United States Attorney, were on brief for appellee.

---

August 19, 2010

---

[*]Of the District of New Hampshire, sitting by designation.

**BARBADORO, District Judge.** Adolfo Verdugo and Rafael Fernández-Roque challenge their convictions for conspiracy to distribute and possess with intent to distribute cocaine. They argue, among other things, that the trial court erred in (1) refusing to suppress certain physical evidence and admissions, (2) allowing testimony from a government agent interpreting wiretapped communications, (3) declining to admit a videotape of a statement that Verdugo gave to government agents, and (4) failing to properly instruct the jury concerning the inferences that can be drawn from a defendant's presence at the scene of a crime. We affirm both convictions.

**I.**

In November 2006, Drug Enforcement Agency ("DEA") agents learned that a large-scale drug distribution operation based in California was importing cocaine into Rhode Island. The agents identified Omar Altamirano-Nunez, also known as Juan Carlos Diaz Delgadillo, as the lead target of their investigation in the Rhode Island area, and obtained a court order authorizing them to intercept Altamirano's telephone calls on a land line and two cell phones. On March 5, 2007, agents began monitoring Altamirano's calls.

**A.    The Intercepted Phone Calls**

On May 26, 2007, Altamirano received a call in Spanish from a man later identified as Verdugo. In that call, placed from

a California cell phone number, Verdugo told Altamirano to "get ready" as he would have "a little dinner" for Altamirano by Monday. Verdugo indicated that he planned to "drop off" some "things" and instructed Altamirano to "come this way . . . some fifty [50] or sixty [60] miles" from where "eighty-four [84] is by nine [9] one [1]." Agents interpreted this to mean that Verdugo planned to deliver drugs to Altamirano on Monday, May 28, 2007 in the Hartford, Connecticut area, near the intersection of Interstate 84 and Interstate 91.

Over the next several days, agents intercepted a number of additional coded conversations detailing the planned drug transaction. The day after Verdugo's call, an unidentified man phoned Altamirano from Mexico and stated, "[M]y mom[] is going over there," to which Altamirano responded that he would be "waiting for her." The unidentified caller also told Altamirano that "the month of February brings twenty-nine [29]," and that he would leave Altamirano "in charge to get the medicine" and "give it to these people." Agents interpreted this to mean that a drug delivery of 29 kilograms was to take place as Verdugo's call had indicated. Subsequent calls revealed that the transaction had been delayed but was expected to occur on Tuesday, May 29, 2007.

On Tuesday evening, Altamirano called Verdugo and Verdugo assured Altamirano that he was "almost arriving" and that Altamirano should "come over . . . to the side where the Simpsons

live." Agents understood this to be a reference to <u>The Simpsons</u>, a television show set in a town called Springfield, and inferred that the drug transaction would occur near Springfield, Massachusetts, which is approximately 30 miles north of Hartford along Interstate 91. Altamirano told Verdugo that he would set out to meet him when Verdugo arrived at the actual rendezvous site, and instructed Verdugo to call him with a nearby exit number upon arrival. Verdugo estimated that he would arrive between 2:00 and 3:00 a.m.

**B. The Surveillance**

Later that evening, agents conducting surveillance followed Altamirano as he left his Providence residence in a Honda minivan and drove to two other residences in the area where he picked up Fernández and a man later identified as Idelfonso Betancourt-Rodriguez. Agents then followed the three men in the minivan to another Providence residence and watched as Fernández and Betancourt got out of the minivan and into a Jeep Cherokee. Agents continued to monitor the suspects' phone calls, and followed the two vehicles as they drove in tandem west on Interstate 90 toward Springfield.

Shortly after midnight, Betancourt called Altamirano. Altamarino noted that the three men were set to arrive ahead of schedule, and decided that they should "take a ride and at the next exit . . . come back to see how things are." A few minutes later,

-4-

they agreed to meet at a nearby Econo Lodge motel to "get together . . . and wait for the guy to call." Agents then followed the vehicles to the motel and watched as the three men went inside.

Verdugo called Altamirano while he was waiting at the motel and informed him that Verdugo was heading north on Interstate 91. Altamirano told Verdugo that he was at the location that they had previously discussed, and the two agreed that Verdugo would "look for a good spot" for them to meet. Altamarino, Fernández, and Betancourt then left the motel and returned to their respective vehicles. Agents followed them as they proceeded first along Interstate 90 and then north on Interstate 91.

Verdugo later informed Altamarino that he had reversed direction and begun heading south on Interstate 91 after he had been unable to find a place to stop. Agents then tracked the Jeep and the minivan as they turned around and began heading south on Interstate 91. At 3:10 a.m., Verdugo called Altamarino to inform him that he had stopped at a rest area. A few minutes later, he called again and instructed Altamirano to "go as if [he was] getting off, and get in between me and the other one," which agents interpreted as an indication that two trucks were parked at the rest area. He assured Altamirano that the area was "clean," and Altamirano told Verdugo that his "guy" was "bringing one of those Cherokees." Verdugo told Altamirano to instruct the driver of the Cherokee to "get in front and . . . right away." Altamirano then

called Betancourt and relayed Verdugo's instructions. Altamirano told Betancourt to "get in between the two [trucks], there's two, the black one and you know which one is the guy's" and then to "[t]urn everything off."

## C. The Drug Transfer

Shortly after Altamirano ended his call to Betancourt, DEA Agent Michael Naylor, one of the agents conducting the surveillance, saw the Jeep turn into a rest area while the minivan continued south on Interstate 91. Naylor watched as the Jeep pulled in between two tractor-trailer trucks and shut its lights off for between thirty seconds and a minute. Immediately thereafter, the Jeep turned its lights back on and left the rest area.

At 3:18 a.m., Fernández called Altamirano and told him, "I'm ready," to which Altamirano responded, "[G]o ahead. I'm driving slowly, pass me by." After this conversation occurred, Naylor and other agents following the Jeep saw the minivan and the Jeep meet and continue together down Interstate 91. In a final call at 3:21 a.m., Verdugo assured Altamirano that "[e]verything [was] fine . . . it's done."

## D. Arrests of Fernández, Betancourt, and Altamarino

Agents stopped the Jeep at approximately 3:30 a.m. and discovered a duffel bag lying on the back seat of the vehicle that contained what was later determined to be 29 kilograms of cocaine.

Fernández and Betancourt were arrested, and a silver T-Mobile cell phone was seized from Fernández's person. The two men were then transported to the Charlton, Massachusetts state police barracks where they were advised of their Miranda rights in Spanish by Special Agent Ryan Arnold of the Bureau of Immigration and Customs Enforcement. After acknowledging that he understood his Miranda rights, Fernández stated that (1) he was unsure of his address in Providence, (2) he worked for a man named Juan Carlos at a garage, and (3) he was a Mexican national who was illegally living in the United States. Fernández also raised his hand when he and Betancourt were shown the silver cell phone and asked: "Whose is this?"

Naylor, along with other DEA agents and law enforcement officers, stopped the minivan and arrested Altamirano at approximately 4:00 a.m. Naylor seized two cell phones from the minivan and confirmed that the phones had the same two cell phone numbers that the agents had been monitoring.

## E.   The Rest Area Encounter

As law enforcement officers stopped and arrested Fernández, Betancourt, and Altamarino, other Massachusetts state troopers and DEA agents secured the rest area. Officer Thomas Nartowicz, who was working with the DEA team, observed two tractor-trailer trucks parked near the exit of the rest area. One of the trucks had California license plates, a sign that read "Verdugo

Trucking," and an engine that was still warm. The other had license plates from a southern state, a cold engine, and was driven by a man who needed to be awakened from sleep and did not speak with a Spanish accent. On the basis of these observations and additional information obtained from members of the DEA team, Nartowicz and Trooper Robert Wycoff focused their attention on the truck with the California plates, shined a flashlight on the cab area of the suspected truck, and, with guns drawn, directed the occupants to come out. Verdugo and a second man, later identified as Esteban Arias-Cortez, emerged from the cab moments later and were handcuffed. Nartowicz then inspected the cab for additional occupants and readily available weapons but found nothing of significance.

Prior to being advised of his Miranda rights, Verdugo told Nartowicz that he owned the truck and was shipping produce to a company in Hatfield, Massachusetts. Nartowicz then asked Verdugo and Arias whether there were any illegal substances in the cab area, and both men said no. Another trooper joined the officers at the scene with a K-9 dog, and obtained Verdugo's consent to search the truck's cab area. The search did not reveal any contraband materials.

Agent Daniel MacIsaac, another member of the DEA team, later obtained Verdugo's consent to search the cab area a second time, and this time he found four cell phones. Through radio

communications with Naylor, MacIsaac learned that Naylor had seized Altamirano's cell phones, and planned to call the California phone number that Verdugo had been using to communicate with Altamirano. When Naylor dialed the phone number, one of the four phones that MacIsaac had just seized from the cab area rang. MacIsaac then asked Verdugo and Arias to whom the ringing phone belonged, and Verdugo replied that the phone was his.

Following the seizure of the four cell phones, Nartowicz advised Verdugo of his <u>Miranda</u> rights in English by reading from a pre-printed card. Verdugo agreed to waive his <u>Miranda</u> rights, and consented to a search of the truck's cargo compartment. Because it was dark, Nartowicz and MacIsaac asked Verdugo and Arias to accompany them to a nearby police barracks for fingerprinting and a more thorough search of the truck, and assured them that they were not under arrest. Both men agreed to proceed with the officers to the barracks, and the group departed.

Verdugo and Arias arrived between 4:00 and 4:50 a.m. at the Northampton, Massachusetts state police barracks, where they were fingerprinted and photographed as agents conducted a search of the truck's cargo compartment. The suspects were then asked to identify the four cell phones that had been seized during the search at the rest area. Verdugo again admitted that he owned the ringing cell phone and asserted that he also owned one of the three remaining phones. Verdugo then signed a "Prisoner Property

-9-

Inventory" form stating that he owned both phones.  Verdugo and Arias were released later that morning.

**F.  <u>Verdugo's Arrest</u>**

On July 11, 2007, a Rhode Island grand jury charged Altamirano, Betancourt, Fernández, and Verdugo with conspiracy to distribute and possess with intent to distribute over five kilograms of cocaine.  A warrant was issued for Verdugo's arrest, and Naylor and DEA Agent Anthony Cardello later traveled to Pomona, California to execute the warrant.  At Naylor's direction, local authorities stopped and arrested Verdugo on July 25, 2007 as he was driving near his home in Pomona.  Verdugo was handcuffed and placed in the back of a patrol car.  Naylor and Cardello, who had observed the traffic stop, approached Verdugo as he sat in the patrol car.  Verdugo confirmed that he understood English, and Naylor read Verdugo his <u>Miranda</u> rights from a pre-printed card as he crouched near the open door of the patrol car.  Verdugo indicated that he understood his rights and agreed to speak with Naylor.

Verdugo initially denied having any involvement in the drug transaction.  Naylor then confronted Verdugo with evidence of his intercepted remarks to Altamirano regarding their planned meeting near Springfield, and Verdugo admitted that he had delivered the 29 kilograms of cocaine to Massachusetts two months earlier, but denied that he had received any money.  Naylor also showed Verdugo a photograph of Altamirano, whom he identified as

Juan Carlos. Verdugo agreed to cooperate, but told the agents that he had nothing to offer.

Agents then brought Verdugo to an interview room at the Pomona police station. There, Naylor presented Verdugo with a form explaining his Miranda rights and read the form to him. Verdugo signed the form, and the agents began questioning him. Verdugo immediately invoked his right to counsel and refused to acknowledge his earlier confession. The interview, which lasted approximately eight minutes, was recorded on videotape.

## G.    The Suppression Hearing and Trial

Verdugo and Fernández each filed motions to suppress the physical evidence obtained from the search of their vehicles and the statements that they made to government agents. After conducting a hearing that extended over several days, the court, ruling from the bench, denied Verdugo's motion to suppress in full, denied Fernández's motion to the extent that it challenged the lawfulness of his arrest, and reserved judgment as to whether Arnold had obtained a valid waiver of Fernández's Miranda rights before questioning him. The court indicated that it would address Fernández's unresolved claim in a written order after it had considered post-hearing filings. Fernández and the government each filed a supplemental memorandum addressing the issue a few days later, but the court did not rule on the motion until the third day of trial, when it denied the motion in a text order.

At trial, the government established that the ringing cell phone seized from the cab of Verdugo's truck and silver T-Mobile cell phone seized from Fernández's person had been used to make and receive intercepted communications with Altamirano. Naylor testified that he could identify both Verdugo's and Fernández's voices on the intercepted communications. The court also allowed Naylor to interpret Altamarino's wiretapped conversations with Verdugo, Fernández, Betancourt, and other alleged conspirators. Naylor testified concerning the statement that Verdugo made when he was arrested, but the court barred Verdugo from introducing the videotape of the statement he made at the Pomona police station. Finally, the court refused to give Fernández's proposed "mere presence" jury instruction and instead gave the jury its own instruction on the subject.

On April 11, 2008, Fernández and Verdugo were convicted of conspiracy to distribute and possess with intent to distribute cocaine following a four-day jury trial. After trial, the district court, sua sponte, issued a written decision concluding that it had mistakenly denied Fernández's motion to suppress his statement to Arnold because the government failed to establish during the suppression hearing that Fernández had voluntarily waived his Miranda rights. United States v. Fernández-Roque, CR No. 07-100 S., 2008 WL 2148750, at *3 (D.R.I. May 21, 2008). Approximately two months later, in response to post-trial motions, the court

-12-

reconsidered its ruling and reinstated its initial order denying Fernández's motion to suppress. United States v. Fernández-Roque, CR No. 07-100-03 S., 2008 WL 2845044 (D.R.I. July 22, 2008). This time, the court relied on Arnold's testimony at trial that Fernández had affirmatively waived his Miranda rights. Id. at *4.

## II.

Verdugo and Fernández attack their convictions on multiple grounds. We begin with their challenges to the district court's suppression rulings.

## A. Suppression Issues

### 1. Verdugo

#### a. The Search of Verdugo's Truck

Verdugo first argues that the district court erred in refusing to suppress the cell phones seized from his truck because the agents lacked probable cause and searched the truck without a warrant. This argument is a nonstarter.

Before MacIsaac searched Verdugo's truck, the agents working with him had intercepted multiple incriminating cell phone calls and corroborated those calls with surveillance. These investigative efforts provided compelling evidence of what the agents reasonably believed was a drug deal in progress. Further, while the agents no longer had reason to believe that drugs would be found inside Verdugo's truck, they had ample grounds to expect that a search of the truck would uncover the cell phone that

-13-

Altamarino had been calling to coordinate the drug transfer. Because the collective knowledge of the agents working with MacIsaac on the investigation is attributable to him when determining whether the search was justified, see United States v. Pardue, 385 F.3d 101, 106-07 (1st Cir. 2004), MacIsaac clearly had probable cause to believe that his search would be productive. Accordingly, his warrantless search was justified under the automobile exception to the warrant requirement. See United States v. Bucci, 582 F.3d 108, 117 (1st Cir. 2009) (automobile exception authorizes warrantless search when agents have probable cause to believe that evidence will be discovered in the place to be searched).

### b.   Verdugo's Rest Area Admission

Verdugo next argues that his statement to MacIsaac, in which he admitted that he owned the ringing cell phone, should have been suppressed because it was obtained in violation of his Miranda rights.  This argument has some bite because Verdugo made the statement (1) without the benefit of Miranda warnings, (2) in response to interrogation, (3) after being forcibly removed from the cab of his truck by multiple officers with drawn guns, and (4) while in handcuffs that had been left on for several minutes. See United States v. McCarthy, 475 F.3d 39, 45 (1st Cir. 2007) (defendant was in custody because he made statement while in handcuffs); but see United States v. Fornia-Castillo, 408 F.3d 52,

-14-

64 (1st Cir. 2005) ("neither the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a de facto arrest"). Nevertheless, we have no need to evaluate the merits of Verdugo's argument because the claimed error was harmless beyond a reasonable doubt. See United States v. Carl, 593 F.3d 115, 119 n.3 (1st Cir. 2010), cert. denied, 130 S. Ct. 2116 (2010) ("[s]tatements induced in violation of Miranda's safeguards are appropriate for analysis under the harmless beyond a reasonable doubt test").

As the district court noted, Verdugo repeated his admission that he owned the ringing cell phone when he signed the property inventory form at the Northampton barracks after he had previously waived his Miranda rights at the rest area. Since Verdugo's post-Miranda admission was well-documented and substantially the same as his pre-Miranda admission, the court's refusal to suppress the pre-Miranda statement was at most harmless error unless the court should also have suppressed the post-Miranda statement. See Tankleff v. Senkowski, 135 F.3d 235, 245-46 (2d Cir. 1998); Feltrop v. Bowersox, 91 F.3d 1178, 1182 (8th Cir. 1996); Bryant v. Vose, 785 F.2d 364, 367 (1st Cir. 1986) (dictum).

Verdugo seeks to overcome this problem by arguing that his post-Miranda statement was "tainted" by MacIsaac's failure to issue Miranda warnings before he obtained Verdugo's initial

admission.  The difficulty with this argument is that it cannot be squared with Supreme Court and First Circuit precedent.

In United States v. Jackson, we explained that,

An earlier, "simple failure to administer the [Miranda] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will [does not] so taint[] the [later] investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."

544 F.3d 351, 360 (1st Cir. 2008) (quoting Oregon v. Elstad, 470 U.S. 298, 309 (1985)).  Thus, where law enforcement officers have not engaged in coercive or improper tactics in obtaining an initial statement, but merely failed to advise a defendant of his Miranda rights, "determining the admissibility of a subsequent statement is relatively straightforward.  Such a statement is admissible if it was obtained after the defendant:  (1) was advised of his or her Miranda rights; and, (2) knowingly and voluntarily waived those rights."  United States v. Marenghi, 109 F.3d 28, 32 (1st Cir. 1997).

Verdugo cites Missouri v. Seibert, 542 U.S. 600 (2004), in support of his argument that his second statement was "tainted" by the first because the circumstances surrounding both statements undermined the effectiveness of the warnings that were given before the second statement was made.  Seibert involved the deliberate use of a two-step interrogation technique in which the suspect was questioned first without the benefit of Miranda warnings and then

-16-

was advised of his rights and questioned again after a confession was obtained. Id. at 605-06. In determining that both statements should have been suppressed, a plurality of the court focused on the circumstances under which the statements were made and identified the "threshold issue" as "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires." Id. at 611-12. Justice Kennedy supplied the fifth vote for the result in a more narrowly reasoned opinion that hinged on the admitted fact that the police had used the two-step interrogation technique "in a calculated way to undermine the Miranda warning." Id. at 622 (Kennedy, J., concurring). When we recently considered Jackson again following the district court's ruling on remand, we declined to determine whether Seibert's reach is limited to cases in which the police set out to subvert a suspect's Miranda rights because the post-Miranda statement at issue in Jackson was admissible even under the Seibert plurality's more context-sensitive test. United States v. Jackson, 608 F.3d 100, 104 (1st Cir. 2010). We follow the same path here.

In the present case, the district court correctly concluded that Verdugo's interrogation at the rest area differed substantially from the two-step interrogation technique that the Supreme Court condemned in Seibert. In Seibert, the defendant was awakened in the middle of the night, arrested, transported to a police station, and questioned for 30 to 40 minutes until she

-17-

confessed. Officers then gave the defendant a 20-minute break, administered Miranda warnings, and immediately confronted her with her pre-warning statements. See Seibert, 542 U.S. at 604-05. Here, in contrast, Verdugo was asked only a limited number of questions before he was read his Miranda rights, the bulk of the post-Miranda questioning occurred at a different location than the pre-Miranda questioning, and Verdugo made his second statement and signed the Property Inventory form over an hour after he first admitted to MacIsaac that the ringing cell phone was his. See United States v. Materas, 483 F.3d 27, 33 (1st Cir. 2007) (finding a subsequent confession untainted where police asked the defendant only one question before reading him his Miranda rights, at another location, fifteen minutes later). These circumstances do not call into serious question the effectiveness of the Miranda warnings that Verdugo received before he made his second admission. The district court therefore committed no error in refusing to suppress Verdugo's post-Miranda statements based on Seibert.

Verdugo also claims that his post-Miranda statement was involuntary even if it was not tainted by his first statement. The circumstances surrounding Verdugo's questioning, however, contain no traces of the "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation" that courts have previously found when they have concluded that statements were involuntarily made. See Jackson, 608 F.3d at 102-03; see also Colorado v. Connelly, 479

-18-

U.S. 157, 167 (1986) (only admissions procured by coercive official police tactics are to be excluded as involuntary); Greenwald v. Wisconsin, 390 U.S. 519 (1968) (confession involuntary where defendant was interrogated for over 18 hours without food, sleep, or necessary medication); Beecher v. Alabama, 389 U.S. 35 (1967) (confession coerced where police held a gun to defendant's head and interrogated him while he was in the hospital and under the influence of morphine); Payne v. Arkansas, 356 U.S. 560 (1958) (confession coerced where defendant was held incommunicado for three days with limited food and threatened with attack from a lynch mob). Verdugo made his post-Miranda admission and signed the inventory form in an open room where he was no longer handcuffed, and he was not subject to prolonged questioning, threats, or duress. Thus, the evidence simply does not support Verdugo's claim that his post-Miranda statement was involuntary. See United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998) (finding no evidence of coercion where police did not threaten violence or serious retaliation, the questioning was not prolonged, and the surrounding atmosphere "appear[ed] to have been benign").[1]

---

[1]Verdugo also argues that the Miranda warnings he received at the rest area do not cover his admission at the Northampton barracks, but he provides no legal analysis or case law to support this proposition. Accordingly, we deem this argument waived because it has not been adequately developed on appeal. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

### c.  Verdugo's Pomona Admission

Verdugo argues that the court should have suppressed the statement that he made when he was arrested because the government failed to prove that he was advised of his <u>Miranda</u> rights before he made the statement.  He also faults the court for failing to investigate whether his statement was voluntarily made.  Neither argument has merit.

Verdugo's first argument challenges the district court's decision to credit the testimony of Agents Naylor and Cardello, who both claimed during the suppression hearing that Verdugo waived his <u>Miranda</u> rights and agreed to speak with them when he was arrested. This argument challenges a credibility assessment made by the district court and such matters are reviewed only for clear error. <u>United States</u> v. <u>Andrade</u>, 551 F.3d 103, 109 (1st Cir. 2008). Verdugo cannot possibly succeed under this deferential standard, because the district court had ample evidentiary support for its determination that Verdugo was advised of his <u>Miranda</u> rights.

Verdugo's second argument fares no better.  The court had no reason to make specific findings on the issue of voluntariness because Verdugo based his suppression argument solely on the agents' alleged failure to administer <u>Miranda</u> warnings.  In any event, the only evidence in the record that in any way supports Verdugo's contention that his statement was involuntary comes from his own testimony, which the district court reasonably found to be

incredible.  Thus, the district court did not err in refusing to suppress Verdugo's Pomona admission.

### 2.  __Fernández__

The only suppression issue that Fernández pursues on appeal is his claim that the district court improperly refused to suppress his statement to Arnold at the Charlton Police Barracks. First, he contends that the court should have excluded his statement because the government failed to prove during the suppression hearing that Fernández affirmatively waived his Miranda rights before responding to agents' questions.  Next, he claims that the court violated his right to due process by failing to rule on his motion to suppress until the third day of trial.  We address each argument in turn.

#### a.    __Waiver Claim__

Fernández does not take issue with the district court's findings that Arnold read Fernández his Miranda rights and that Fernández understood his rights, nor does he dispute the court's determination that the record contains no evidence that "the [d]efendant's decision to answer . . . questions was influenced by intimidation, coercion, or deception[] . . ."  Fernández-Roque, 2008 WL 2148750, at *3.  Instead, he rests his argument entirely on the fact that the government did not prove at the suppression hearing that Fernández affirmatively waived his Miranda rights before he responded to questions.  The problem with this argument

is that it fails to take account of the fact that the court relied on Arnold's trial testimony that Fernández affirmatively waived his Miranda rights when it ultimately upheld its decision to admit Fernández's statement. Fernández-Roque, 2008 WL 2845044, at *4. Because Fernández does not challenge the district court's decision to rely on trial testimony to fill what Fernández claims is a gap in the suppression hearing record, he is in no position to argue that suppression is required because of the claimed gap.[2]

### b. Timing Claim

Fernández also presents an unconvincing claim that the district court committed reversible error in failing to rule on his motion to suppress before trial. Because Fernández raises this claim for the first time on appeal, we review it for plain error. United States v. Rodriguez-Lozada, 558 F.3d 29, 38 (1st Cir. 2009). To satisfy the plain error standard, Fernández "must show an error that was plain (i.e., obvious and clear under current law), prejudicial (i.e., affected the outcome of the district court proceedings), and that seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." United States

---

[2]Because the district court based its ruling on evidence in the trial record that Fernández affirmatively waived his Miranda rights, we need not consider whether his statement could have been admitted even in the absence of an affirmative waiver. See Berghius, 130 S. Ct. at 2264 (recognizing that "a suspect who has received and understood the Miranda warnings, and has not invoked his Miranda rights, waives the right to remain silent by making an uncoerced statement to the police.").

v. Rivera Calderon, 578 F.3d 78, 95 (1st Cir. 2009), cert. denied, 130 S. Ct. 1107 (2010) (quoting United States v. Griffin, 524 F.3d 71, 76 (1st Cir. 2008)).  Although Fernández points to the fact that Fed. R. Crim. P. 12(d) ordinarily requires a motion to suppress to be resolved before trial, he cites no case law to support his claim that a delayed suppression ruling can give rise to a due process violation.  This failure alone has doomed other claims  that were subject to plain error review.  See, e.g., United States v. Marcano, 525 F.3d 72, 74 (1st Cir. 2008); United States v. Carballo-Rodriguez, 480 F.3d 62, 70 (1st Cir. 2007).  Moreover, Fernández has failed to present a persuasive argument that he was prejudiced by the timing of the court's suppression ruling. Without evidence of prejudice, Fernández simply cannot succeed on a claim that is subject to plain error review.  See United States v. Perez-Cruz, 558 F.3d 50, 53 (1st Cir. 2009), cert. denied, 130 S. Ct. 183 (2009).

**B.   Trial Issues**

**   1.   Interpretations of Intercepted Conversations**

Verdugo cites 32 instances in which he claims that the district court erred in allowing Naylor to testify concerning his interpretation of words and phrases used by the conspirators during their intercepted conversations.  The only time Verdugo actually objected to a proposed interpretation, however, was in response to Naylor's innocuous explanation that he had initially misinterpreted

-23-

Verdugo's statement about seeing "some guys" at the rest area to mean that Verdugo had spotted the surveillance team. Verdugo otherwise failed to object to Naylor's interpretations and, when the court called counsel to the bench to express concern as to why counsel was not objecting, counsel informed the court that "[he] just wanted the court to know [his] reason was [that he] didn't want to limit [his] cross-examination with respect to these phone calls because [he] d[id] intend to question [Naylor] about certain calls." The government argues that counsel's decision not to object to Naylor's interpretations results in a waiver of Verdugo's right to challenge the interpretations on appeal. We agree.

As we have noted, claims that are not preserved in the trial court typically are reviewed for plain error. United States v. Medina, 427 F.3d 88, 91 (1st Cir. 2005). An intentional relinquishment of a claim, however, results in a complete waiver of the right to raise the claim on appeal. Id. (finding that defendant waived his right to object to the admission of physical evidence on appeal where his counsel told the judge at a bench conference during trial that he had "no objection to [the evidence] coming in"); see also United States v. Washington, 434 F.3d 7, 11 (1st Cir. 2006) (defense counsel waived the right to object to the admission of telephone calls at trial where he made the "deliberate strategic choice" to play them to the jury to discredit the prosecution's chief witness). Here, Verdugo's counsel made a

tactical choice not to object to Naylor's interpretations in order to lay the groundwork for later cross-examination. Having made this choice, Verdugo cannot now challenge the court's failure to exclude Naylor's interpretations on appeal.

## 2.  Videotape of Verdugo's Interrogation

Verdugo next claims that the district court improperly barred him from using the videotape of his interrogation at the Pomona police station to impeach Naylor's trial testimony. Naylor testified on direct examination about the statement Verdugo made when he was arrested, but the subject of the videotaped statement did not come up until cross-examination, when the following exchange occurred:

> Q.  He [Verdugo] didn't admit to anything [during the videotaped statement], either, am I correct sir?
>
> A.  I don't know – he didn't admit to it. He said he wanted a lawyer. He said, the only thing I can talk about is against myself. I'm not sure if he admitted it. But I know I talked to him about what we talked about on the scene. So I don't know exactly what was admitted to on tape again. I don't really remember. But I remember speaking to him. He didn't deny what I talked about on the street, if that's what you mean[,] sir.

(Trial Tr. vol. 2, 111, Apr. 8, 2008.)

At that point, Verdugo's counsel asked the court for permission to play the videotape, arguing that the tape was admissible because it contradicted Naylor's testimony. The court denied counsel's request because it concluded that "what [Naylor]

-25-

. . . said about [the] interview is not inconsistent with what the video shows." (Id. at 120.) We agree with the district court.

A party ordinarily may introduce extrinsic evidence to impeach testimony by contradiction if the extrinsic evidence concerns a subject that is not collateral to the issues being tried. United States v. Cruz-Rodriguez, 541 F.3d 19, 30 (1st Cir. 2008), cert. denied, 129 S. Ct. 1017 (2008). Here, however, the videotape was properly excluded whether or not it was collateral because it simply did not contradict Naylor's testimony. The only portion of the videotape that arguably bears on the issue of Naylor's credibility is the following exchange:

> **Naylor:** I know we spoke for a few minutes on the street. And you said that you never brought any money back . . . that time. And were talking like that. I just wanna, you know . . . so I understand we talked about that on the street. And we talked about um. . [.] the 29 kilos that you brought there. That's the stuff we talked about on the street. We're not going to talk about this now, do you understand. Cause you're saying now you need a lawyer. But on the street when you were talking to me about that . . [.] um, um . . [.] that's why you're being brought up here. Do you understand? That's why we're here from Rhode Island. You understand that[,] correct?

> **Verdugo** I don't know what you're talking about.

In responding to Naylor, Verdugo disclaimed knowledge about their prior discussion, but he did not deny his alleged role in the conspiracy. Thus, the videotape is consistent with Naylor's

testimony that Verdugo "didn't deny what [Naylor] talked about on the street."

Verdugo also incorrectly claims for the first time on appeal that the court should have admitted the videotape pursuant to the rule of completeness embodied in Fed. R. Evid. 106. The short answer to this claim is that Rule 106 does not apply to testimony about unrecorded oral statements such as the one that Verdugo gave to Naylor and Cardello when he was arrested. United States v. Lopez-Medina, 596 F.3d 716, 734 (10th Cir. 2010). In any event, while the district court retained substantial discretion under Fed. R. Evid. 611(a) to apply the rule of completeness to oral statements, id., Naylor cites no case law that supports the use of the rule under these circumstances. The rule of completeness ordinarily comes into play when a statement is offered to explain another statement that is being admitted into evidence. See Fed. R. Evid. 106 advisory committee's note ("The rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial."). It does not ordinarily allow otherwise inadmissible evidence to be used to create doubt as to whether the admitted statement was ever made. Accordingly, the district court did not commit plain error in refusing to admit the videotape under the rule of completeness.

### 3.    The Mere Presence Jury Instruction

Fernández faults the district court for delivering its own jury instruction explaining the concept of "mere presence" rather than the instruction that Fernández proposed.[3] This type of claim can succeed only in the "relatively rare case" where "the requested instruction was (1) substantively correct; (2) not substantially covered elsewhere in the charge; and (3) concerned a

---

[3]Fernández requested the following jury instruction:

Mere presence at the scene of a crime or mere association with the co-conspirators will not themselves support a conspiracy conviction. Mere presence at the scene of the crime and knowledge that a crime is being committed are also not sufficient to establish a defendant's guilt.

The district court declined to charge the jury as he requested, and instead issued the following instructions:

Mere presence at the scene of a crime is not alone enough, but you may consider it among other factors. Intent may be inferred from the surrounding circumstances.

. . .

[M]ere presence at the scene of a crime, or merely knowing that a crime is being committed or is about to be committed, is not sufficient conduct to find the defendant committed that crime. However, the law recognizes a difference between mere presence and culpable presence in the context of drug trafficking activities. While mere presence is not sufficient to base criminal charges, a defendant's presence at the point of a drug sale taken in light of attendant circumstances can constitute strong evidence of complicity. Thus[,] you must evaluate the circumstances of this case in order to determine the quality of the defendant's presence at a location where drugs are found. This will assist you in determining whether the defendant was merely present or culpably present.

-28-

sufficiently important point that the failure to give it seriously impaired the defendant's ability to present his or her defense." United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009) (quoting United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001)). We review the instruction given "not in isolation but in the context of the entire charge" in determining whether the district judge clearly conveyed the relevant legal principles, and remain "mindful that the district court has considerable discretion in how it formulates, structures, and words its jury instructions." Id.

The district court's own "mere presence" instruction was an entirely accurate recitation of First Circuit case law that more than adequately explained the concept to the jury, particularly when viewed within the context of the entire jury charge. Fernández alleges that the district court's instruction diminished the importance of his "willful participation" in the conspiracy. "Willful participation," however, was addressed in great detail elsewhere in the jury charge; in fact, the court instructed the jury as to the government's burden of proving that Fernández "willfully" joined the conspiracy immediately after it explained the concept of "mere presence." Thus, the court did not err in refusing to give Fernández's mere presence instruction because the court's own instruction adequately covered the issues that Fernández sought to cover with his instruction.

## III.

For the foregoing reasons, we affirm the district court's denial of defendants' motions to suppress. We further determine that Verdugo waived his right to object to Naylor's interpretive testimony, that the court properly excluded Verdugo's videotaped statement, and that the court's "mere presence" instruction was a suitable substitute for Fernández's proposed instruction on the subject.[4] Both defendants' convictions are affirmed.

---

[4]Verdugo also argues that (1) he was denied the effective assistance of counsel, (2) his sentence of 151 months was unreasonable, (3) the court's instruction that the jury could find Verdugo guilty if the object of the conspiracy was either to possess cocaine with intent to distribute or to distribute cocaine was improper because the indictment was phrased in the conjunctive, and (4) the verdict was not supported by substantial evidence. These arguments do not require extended discussion. Verdugo's ineffective assistance claim is premature. See United States v. Mathis, 413 F.3d 139, 155 (1st Cir. 2005). He has not given this court sufficient grounds to second-guess the district court's sentencing judgment. See United States v. Morales-Machua, 546 F.3d 13, 25 (1st Cir. 2008) (explaining that a defendant carries a "heavy burden" when claiming on appeal that his sentence is unreasonable). The court's multiple-object conspiracy instruction is unassailable. See United States v. Gerhard, Nos. 08-2056, 08-2300, 08-2450, 2010 WL 2978098, at *20 (1st Cir. July 30, 2010)("we have routinely affirmed the use of the conjunctive in indictments followed by the use of the disjunctive in jury instructions"). Finally, as the record demonstrates, abundant evidence was produced at trial to support the verdict.