# United States Court of Appeals
## For the First Circuit

No. 20-1156

UNITED STATES OF AMERICA,

Appellee,

v.

MINERVA RUIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch and Kayatta, Circuit Judges,
and Woodcock,* District Judge.

Emmett E. Robinson and Robinson Law Firm, LLC, on brief for
appellant.
Lauren A. Graber, Assistant United States Attorney, and
Andrew E. Lelling, United States Attorney, on brief for appellee.

June 4, 2021

* Of the District of Maine, sitting by designation.

**WOODCOCK, District Judge.** On July 24, 2019, a jury convicted Minerva Ruiz of one count of conspiracy to distribute and to possess with intent to distribute heroin in violation of 21 U.S.C. § 846 and one count of distribution of heroin in violation of 21 U.S.C. § 841(a)(1). On January 21, 2020, the district court imposed a downward variant sentence of forty-eight months of imprisonment followed by a two-year term of supervised release.

Ruiz appeals her convictions and sentence on three grounds. First, she contends the district court abused its discretion by finding certain coconspirator statements were non-hearsay under Federal Rule of Evidence 801(d)(2)(E) and admitting the statements into evidence. Second, she submits the district court failed to properly instruct the jury about the elements of her offenses. Third, she argues the district court clearly erred by applying a three-level mitigating role reduction under United States Sentencing Guidelines § 3B1.2 rather than a four-level minimal role reduction. We affirm the convictions and sentence.

## I. Background

Because Ruiz does not contest the sufficiency of the evidence presented against her, we recount the facts in a "balanced way, without favoring either side." United States v. Arias, 848 F.3d 504, 509 n.1 (quoting United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014)).

## A.    The Crime

In June of 2017, the United States Drug Enforcement Administration (DEA) and Homeland Security Investigations (HSI) began investigating a man named Dalnovis Delarosa Arias.  The investigation started after a Puerto Rican HSI confidential source (CS) told agents that an unidentified male using a specific cellphone number was selling heroin in Massachusetts.  Under the oversight of federal agents, the CS set up a phone call on June 28, 2017, between Delarosa and a cooperating witness named Bernie Bravo.  During the call, Delarosa told Bravo he could sell Bravo multiple kilograms of heroin, and Delarosa agreed to meet Bravo in Charlestown, Massachusetts, to discuss the terms of the heroin deal.  Delarosa told Bravo that he did not drive but would find a ride to the meeting.  At the instruction of federal agents, Bravo recorded this call and all subsequent communications with Delarosa.

On July 13, 2017, Bravo and Delarosa met in Charlestown to discuss a heroin deal.  At the time, Delarosa was dating Minerva Ruiz.  Around 2:00 p.m., before the Charlestown meeting, law enforcement saw Delarosa and Ruiz outside an apartment on Milton Street in Lawrence, Massachusetts, where Ruiz lived with her parents.  Law enforcement observed Delarosa and Ruiz standing near the rear of a white Honda Civic that was registered to Ruiz at the Milton Street address.  After some time, Delarosa and Ruiz departed

in the Honda Civic with Ruiz driving.  Federal agents followed the couple to the Bunker Hill Mall in Charlestown, Massachusetts.

When they arrived at the Bunker Hill Mall around 4:20 p.m., Bravo was waiting for Ruiz and Delarosa.  Bravo climbed into Ruiz's car and secretly recorded the ensuing conversation.  Once again, Delarosa offered to sell Bravo some heroin and Bravo said he was interested.  Bravo told Delarosa to call him after securing the heroin.

Ruiz stayed in the car for the entire fifteen-minute meeting.  At one point, Bravo said he was uncomfortable talking about selling drugs in front of a woman.  Delarosa told Bravo not to worry because Ruiz was his "right hand in everything."  Later, Bravo again said he was embarrassed to discuss dealing drugs in a woman's presence.  This time, Ruiz encouraged Bravo to speak freely because her relationship with Delarosa was similar to Bravo's relationship with his own boss.

After the July 13, 2017, Charlestown meeting, Bravo and Delarosa spoke by phone several times.  During these calls, Delarosa informed Bravo he was still trying to get his hands on some heroin.  Around August 22, 2017, Delarosa called Bravo and said he had just returned from New York with heroin.  He offered to sell Bravo two kilograms of heroin for $60,000 per kilogram.  The following day, the two men spoke again by phone and agreed to meet on August 24, 2017, and consummate the transaction.

- 4 -

On August 24, 2017, Ruiz drove Delarosa in her Honda Civic to the Bunker Hill Mall in Charlestown. When they arrived around 2:30 p.m., Bravo and his recording device were waiting. Bravo got into the Honda Civic and asked where the heroin was. Delarosa said, "Everything is there." Bravo peered into a bag behind Ruiz's seat and saw two cereal boxes, Froot Loops and Apple Jacks; each contained a brick-shaped object wrapped in black tape.

Next, Bravo told Delarosa and Ruiz that he would retrieve their payment from his car. He exited the Honda Civic, walked to his car, and popped the trunk. This signaled to law enforcement that there was heroin inside Ruiz's car. Law enforcement arrested Ruiz and Delarosa around 2:40 p.m. on August 24, 2017. Federal agents recovered the two brick-shaped objects from Ruiz's vehicle. A subsequent laboratory analysis confirmed the objects contained heroin, with a net weight of about 1.8 kilograms.

B.    **The Trial**

On September 20, 2017, a federal grand jury handed down a two-count indictment against Delarosa and Ruiz for conspiracy and distribution. Delarosa pleaded guilty; Ruiz went to trial in July 2019.

Before trial, Ruiz moved to exclude the recordings and transcripts of conversations between Delarosa and Bravo as inadmissible hearsay. The government opposed the motion and argued the statements were non-hearsay coconspirator statements under

Federal Rule of Evidence 801(d)(2)(E).  On the first day of trial, the district court denied the motion to exclude, reasoning the conversations in the Honda Civic were clearly admissible as opposing party statements or statements of coconspirators.

On the second day of Ruiz's trial, the government introduced recordings of the July 13, 2017, and August 24, 2017, face-to-face meetings in her car, when Ruiz was present, and the June 28, 2017, and August 22, 2017, phone calls between Delarosa and Bravo, in which Ruiz did not participate.  The government moved to introduce English transcripts because the recordings were in Spanish.  Ruiz maintained a standing hearsay objection to this evidence.

At the close of the government's case, the district court overruled Ruiz's objection and found by a preponderance of the evidence that Ruiz and Delarosa were coconspirators.  To make this finding, the district court relied on the transcripts of the two meetings and the fact that Ruiz drove Delarosa to two meetings in which Delarosa and Bravo openly discussed the sale of heroin. However, the district court did not rely on Bravo's trial testimony.  According to his testimony about the transaction on August 24, 2017, Bravo got into Ruiz's Honda Civic and twice asked where the heroin was; the first question prompted Delarosa to say that the heroin was in a cereal box and the second prompted Ruiz to point to the cereal boxes behind the driver's seat.  Referring

to these aspects of Bravo's account, the district judge acknowledged Bravo's "credibility . . . [had] been called into doubt . . . because he[] doubled down on something which clearly [was]n't in the transcript" of the conversations in the Honda Civic. Ruiz again objected to the recordings and transcripts.

### C.    The Jury Instructions and Verdict

Before trial, Ruiz submitted proposed jury instructions; one read:

> 6.    The government must prove, beyond a reasonable doubt, that in addition to being present or knowing about a crime, the defendant knowingly, deliberately, and voluntarily associated herself with the crime in some way as a participant-someone who wanted the crime to be committed, not a mere spectator. United States v. Verdugo, 617 F.3d 565 (1st Cir. 2010).

Before trial, the government objected to this instruction. It contended the instruction went "well beyond the pattern instructions" concerning the meaning of "mere presence." The government instead urged the district court to adopt the same instruction this Court approved in United States v. Verdugo, 617 F.3d 565, 579 n.3 (1st Cir. 2010).

On the final day of the Ruiz trial, the district court circulated draft jury instructions. The draft instructions included language substantially the same as Ruiz's proposed "mere presence" instruction. The government objected to the words "intentionally associated herself." Specifically, the government

claimed the draft instruction was duplicative because "[m]ere presence applies to all of the instructions," but conspiracy, distribution, and aiding and abetting require different mens rea for conviction. The district court overruled the government's objection after concluding the language "may be duplicative" but was not problematic because whether Ruiz intended to commit the charged offenses was the key issue in her case.

Later that day, the district court charged the jury. The district court told the jury it could not convict Ruiz of distribution of heroin unless it found beyond a reasonable doubt that she (1) "transferred heroin to another person," on the alleged date, (2) "knew that the substance was heroin," and (3) "acted intentionally . . . [t]hat is, that it was her conscious object to transfer the heroin to another person."

The district court further explained to the jury that it "may also find Ms. Ruiz guilty of either possession with intent to distribute or distribution under a theory of aiding and abetting" if (1) the government proved beyond a reasonable doubt that another person committed the charged offense, and (2) "Ms. Ruiz consciously shared the other person's knowledge of the underlying criminal act, intended to help him, and willfully took part in the endeavor seeking to make it succeed."

The district court then instructed the jury that "[m]ere presence at the scene of a crime and knowledge that a crime is

being committed are . . . not sufficient to establish aiding and abetting." It noted "the law recognizes the difference between mere presence and culpable presence in the context of drug-trafficking activities" and stated that "a defendant's presence at the point of a drug sale, taken in light of attendant circumstances, can constitute strong evidence of complicity." Thus, the district court instructed the jury to "evaluate the circumstances of this case in order to determine the quality of the defendant's presence at a location where drugs are found. This will assist you in determining whether [she] was merely present or was culpably present."

This language was nearly identical to the government's proposed Verdugo instruction. However, the district court added a final sentence on "mere presence," making the instruction substantially similar to instruction number six in Ruiz's proposed jury instructions. The district court stated:

> In order to find Ms. Ruiz guilty, the government must prove beyond a reasonable doubt that in addition to being present or knowing about the crime, that she intentionally associated herself with the crime charged in some way as a participant, someone who wanted the crime to be committed, not as a mere spectator.

Once again, Ruiz did not object to this instruction, but the government did. The government reiterated that this sentence should be struck because it was inconsistent with this Court's

statement of law in Verdugo, 617 F.3d at 579 n.3.  The district court again overruled the government's objection.  Several hours later, the jury convicted Ruiz on both counts of the indictment.

### D.    The Sentencing

On January 17, 2020, Ruiz appeared before the district court for sentencing.  Before the sentencing hearing, the United States Office of Probation and Pretrial Services (PO) prepared a Presentence Investigation Report (PSR), which calculated Ruiz's offense level to be twenty-six with a criminal history category of I.  The PO's calculations included a two-level reduction in Ruiz's offense level under U.S.S.G. § 3B1.2(b) for being a minor participant in the crime.  With this offense level and criminal history category, the guideline sentence range (GSR) was sixty-three to seventy-eight months of imprisonment, two to five years of supervised release, a fine range of $25,000 to $20 million, and a $200 special assessment.  Ruiz objected to the calculated total offense level of twenty-six and argued that instead of a two-level minor participant reduction, she deserved a four-level reduction as a minimal participant under U.S.S.G. § 3B1.2(a).

At the sentencing hearing, the district court concluded a three-level mitigating role reduction was appropriate because it did not view Ruiz's role in the offense as minimal.  It noted Ruiz went on two trips to discuss and facilitate a heroin deal and told Bravo to think of her relationship with Delarosa as similar to

Bravo's relationship with his own boss. However, the district court also acknowledged facts suggesting Ruiz was less culpable than Delarosa. For instance, there was no evidence Ruiz received any money from selling heroin or that she had previously participated in drug trafficking with Delarosa.

After the three-level mitigating role reduction, Ruiz's base offense level was twenty-five. A criminal history category of I and an offense level of twenty-five produced a GSR of fifty-seven to seventy-one months of incarceration, two to five years of supervised release, a fine of $20,000 to $20 million, and a special assessment of $200. The district court varied downward because Ruiz has a daughter with special needs and sentenced Ruiz to forty-eight months of imprisonment, no fine, two years of supervised release, and a $200 special assessment.

## II. Discussion

Ruiz raises three issues on appeal; we affirm the district court because each claim of error is without merit.

### A. The Coconspirator Statements Under Rule 801(d)(2)(E)

Ruiz first contends the district court abused its discretion by admitting transcripts and recordings of conversations between Delarosa and Bravo. She urges that under United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977), and its progeny, there was insufficient extrinsic evidence for the

- 11 -

district court to find by a preponderance that she was in a conspiracy with Delarosa.

Ruiz preserved her challenge to the admission of the transcripts and recordings by objecting before and during trial when the district court admitted them into evidence. We review preserved challenges to the admission of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E) for either clear error or abuse of discretion. United States v. Lara, 970 F.3d 68, 77-78 (1st Cir. 2020). When a defendant's challenge would fail under either standard, we need not decide which standard applies. Id. at 78.

In federal court, hearsay statements are inadmissible for their truth unless a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court authorize their admission. Fed. R. Evid. 802. Under Federal Rule of Evidence 801(d)(2)(E), a statement offered against an opposing party that "was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E). Our decision in Petrozziello explains that such a statement is admissible when the trial judge finds "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." 548 F.2d at 23.

- 12 -

To satisfy Petrozziello and Rule 801(d)(2)(E), the proponent of a statement must introduce some "extrinsic evidence" of a conspiracy between the defendant and the declarant. United States v. Piper, 298 F.3d 47, 52 (1st Cir. 2002). In this context, extrinsic evidence means "other evidence sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it." Id. The trial judge considers the alleged hearsay statements alongside the proffered extrinsic evidence and determines whether the proponent of the statements has established by a preponderance that the coconspirator statements are not hearsay under Rule 801(d)(2)(E). See United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993).

Here, Ruiz contends there was no extrinsic evidence of a conspiracy between herself and Delarosa.[1] She first urges that the district court improperly weighed circumstantial evidence that she twice drove Delarosa to meet with Bravo about a heroin deal. Ruiz observes there was no evidence she knew on either occasion that Delarosa planned to meet Bravo. She posits that the only evidence of a conspiracy was Bravo's testimony that Ruiz confirmed the location of the heroin during the second meeting. Ruiz, however, says Bravo's testimony was not credible because it

_____

[1] Ruiz does not challenge whether the purported coconspirator statements were made in furtherance of the conspiracy.

- 13 -

contradicted a transcript of Bravo's recording of the meeting. Thus, she concludes she was merely present at the scene of the conspiracy and, therefore, argues the district court erroneously admitted Delarosa's conversations with Bravo.

Ruiz's arguments lack support. As the district judge made clear, Bravo's trial testimony was immaterial to its Petrozziello ruling. Rather, the district court concluded the government proved by a preponderance that Delarosa and Ruiz were in a conspiracy because (1) "at the first meeting and then again at the second meeting, . . . she was driving the car" and (2) "it was plainly discussed in the first meeting that the heroin, the brown thing, was the object of the transaction." Ruiz's driving Delarosa in her automobile to two meetings with a wholesale drug dealer is the extrinsic evidence between Ruiz and the declarants that she now claims is missing.

Although the district court may not have expressly relied on this portion of the transcript, Ruiz's own inculpatory statements from the transcripts further support the district court's Petrozziello ruling. When Bravo hesitated to talk about purchasing drugs in front of Ruiz, she reassured him, saying, "Let me tell you something[,] [Delarosa] and I would be like you and [your boss]." Ruiz's statement is not hearsay and is admissible under Federal Rule of Evidence 801(d)(2)(A) as a statement of an opposing party. See United States v. Mitchell, 596 F.3d 18, 24

- 14 -

(1st Cir. 2010) (accepting a district court's use of "recordings of phone calls, which came into evidence as the defendant's own admissions" as extrinsic evidence of a drug conspiracy). By making this statement, Ruiz inculpated herself in the conspiracy and explained her role. Ruiz's own statement is additional extrinsic evidence she claims is lacking.

Ruiz's mere presence argument fares no better. The circumstantial evidence at trial indicated Ruiz actively participated in the conspiracy. She twice drove Delarosa to meet with Bravo about a heroin transaction. According to the transcripts of the conversations in the Honda Civic, she saw and heard the men planning criminal activity. Despite this, Ruiz drove Delarosa to another meeting with Bravo. Therefore, rather than Ruiz being "merely present," the evidence supported the district court's conclusion that she participated in the conspiracy by ferrying Delarosa to two meetings with a potential buyer and driving approximately 1.8 kilograms of heroin to the second meeting.

In summary, the government presented extrinsic evidence at trial, including Ruiz's own inculpatory statement and her driving Delarosa to a heroin sale, to support the admission of the statements of coconspirators. Alongside the coconspirator statements, such as Delarosa referring to Ruiz as his "right hand in everything," the district judge was fully justified in

- 15 -

concluding that this evidence proved by a preponderance that Ruiz and Delarosa were coconspirators. Ruiz is correct that the government introduced no direct evidence that she knew she was driving Delarosa to meet Bravo. It does not matter. The government's direct and circumstantial evidence satisfied Petrozziello. The district court's ruling was neither clear error nor an abuse of discretion.

## B. The Jury Instructions

Ruiz next argues the district court's jury instructions were plain error. She claims the district court incorrectly instructed the jury that it could convict her of conspiracy and aiding and abetting based on intent alone. This claim of error is waived, and we therefore reject it.

When a party affirmatively requests a particular jury instruction, that party waives its right to challenge that instruction on appeal. See United States v. Chen, No. 19-1962, 2021 U.S. App. LEXIS 14572, at *8 (1st Cir. May 17, 2021) ("An issue may also be waived if counsel's own conduct invited the trial judge's ruling."); Lara, 970 F.3d at 75 ("[The defendant] targets language in the instruction that is not materially different from the language that his counsel requested. Accordingly, the challenge has been waived."); United States v. Kakley, 741 F.2d 1, 3 (1st Cir. 1984) (concluding that a defendant who requested a particular jury instruction concerning the elements of

conspiracy had waived his right to challenge the instruction on appellate review).

This is a textbook waiver. Absent unusual circumstances not present here, see United States v. Orsini, 907 F.3d 115, 120-21 (1st Cir. 2018), Ruiz may not challenge language in the jury instructions that she herself proposed. That is the end of the matter.

## C.     The Mitigating Role Reduction

Ruiz's final challenge is that the district court wrongly imposed a three-level, rather than four-level, mitigating role reduction. We have explained that a sentencing judge's decision concerning a mitigating role adjustment is "a fact-specific inquiry" and reversal is appropriate only where the defendant demonstrates "the district court's determination as to his role in the offense was clearly erroneous." United States v. Mendoza-Maisonet, 962 F.3d 1, 23 (1st Cir. 2020) (quoting United States v. De la Cruz-Gutiérrez, 881 F.3d 221, 225-26 (1st Cir. 2018)). This standard is highly deferential, and reversal is rare. See id.

Section 3B1.2 of the United States Sentencing Guidelines permits a sentencing judge to decrease the offense level of a defendant who had a mitigating role in the offense. U.S. Sentencing Guidelines Manual § 3B1.2 (U.S. Sentencing Comm'n 2018). The Guideline commentary includes a non-exhaustive

- 17 -

list of factors for courts to consider when ruling on a mitigating role adjustment, including the defendant's understanding of the criminal activity's scope and structure, whether the defendant participated in planning or organizing the activity, whether the defendant exercised decision-making authority, or influenced the exercise of such authority the defendant's specific acts, and the benefits the defendant derived from the criminal activity. Id. § 3B1.2 cmt. n.3(C)(i)-(v).

Under section 3B1.2(a), a sentencing judge may reduce a minimal participant's offense level by four levels. Id. § 3B1.2(a). This reduction "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." Id. § 3B1.2 cmt. n.4. A "defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." Id. Section 3B1.2(b) permits a sentencing judge to reduce a minor participant's offense level by two levels. Id. § 3B1.2(b). A defendant is a minor participant when the defendant is a person "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." Id. § 3B1.2 cmt. n.5. A defendant who is neither a minimal participant nor a minor participant but had a mitigating role may receive a three-level reduction. Id. § 3B1.2.

- 18 -

A defendant bears the burden of proving a mitigating role adjustment is applicable by a preponderance. Mendoza-Maisonet, 962 F.3d at 23. A defendant is never entitled as a matter of law to a mitigating role downward adjustment. See United States v. Montes-Fosse, 824 F.3d 168, 173 (1st Cir. 2016); United States v. Santos, 357 F.3d 136, 143 (1st Cir. 2004)("[E]ven those who serve purely and simply as drug couriers are not automatically guaranteed mitigating role reductions.").

Ruiz insists the district court's decision to apply a three-level mitigating role reduction was clearly erroneous. She relies on language from United States v. Innamorati, 996 F.2d 456, 490 (1st Cir. 1993), and argues that as a drug courier in a single transaction, she should have received a four-level minimal participant reduction. Her reliance on Innamorati is unpersuasive. First, to the extent that Ruiz implies drug couriers should automatically receive a mitigating role reduction, we have previously rejected this argument and do so again here. See United States v. Vargas, 560 F.3d 45, 51 (1st Cir. 2009) ("The appellant seems to assume that couriers are automatically entitled to mitigating role adjustments. That is an incorrect assumption."). Second, the language Ruiz cites from Innamorati concerns a prior version of the Guideline commentary which listed "an individual recruited as a courier for a single transaction in a[] larger enterprise" as a minimal participant. 996 F.2d at 490. This

- 19 -

commentary is no longer in force.  See U.S.S.G. app. C supp., amend. 635.  The district court did not err by failing to apply inapplicable Guideline commentary.

Here, the district court rejected Ruiz's argument for a four-level mitigating role adjustment after considering her involvement in the heroin conspiracy and distribution offenses. The district court determined Ruiz could not be a minimal participant because she drove Delarosa to two meetings with Bravo. The district court also considered Ruiz's inculpatory statements, in which she encouraged Bravo to speak freely about the drug transaction in her presence because he could think of Delarosa as her "boss."  At the same time, the district court's analysis was not one-sided.  It also noted that there was no evidence that Ruiz made any money from heroin dealing or that she had previously helped Delarosa sell drugs.  For these reasons, the district court concluded that a three-level, rather than four-level adjustment was appropriate.

The record amply supports the district court's finding that Ruiz was no mere courier or mule.  Ruiz drove Delarosa, a man she described as her boss and who could not drive himself, to a $120,000 drug deal with nearly 2 kilograms of heroin in her car. On these facts, we find nothing clearly erroneous about the district court's decision to apply a three-level mitigating role reduction.  See De la Cruz-Gutiérrez, 881 F.3d at 226-27 (holding

that a district court's conclusion that a defendant was no "ordinary mule" for purposes of a mitigating role enhancement was not clearly erroneous because a district court's choice between supportable alternative inferences cannot be clearly erroneous).

As we have said before, whether and to what extent a defendant occupies a mitigating role "is, within wide limits, best left to the sentencing court." Vargas, 560 F.3d at 51. In this case, the sentencing judge did not come close to traversing those wide limits.

**III. Conclusion**

Affirmed.