# United States Court of Appeals
## For the First Circuit

No. 06-1920

UNITED STATES OF AMERICA,

Appellee,

v.

KEITH MATERAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, and Lynch, Circuit Judges.

Frank L. Bruno, for appellant.
Terry L. Ollila, Assistant United States Attorney, with whom
Thomas P. Colantuono, United States Attorney, and Aixa Maldonado-
Quiñones, Assistant United States Attorney, were on brief, for
appellee.

April 10, 2007

**TORRUELLA**, **Circuit Judge**.  Defendant-appellant Keith Materas appeals the district court's denial of his motions to suppress evidence seized and statements made during the search that led to his arrest for possession with intent to distribute ecstasy and methamphetamine.  We agree with the district court that Materas was not entitled to a Franks hearing[1] on the suppression of the evidence, and that Materas was not entitled to suppression of statements made after he waived his Miranda rights.

## I. Background

### A. The Search Warrant

On October 14, 2004, Detective Frank Bourgeois of the Nashua Police Department applied for a no-knock search warrant for 374 Thornton Street, Manchester, New Hampshire, which he alleged was Materas's residence.  In his supporting affidavit, Detective Bourgeois relied on the following events as a basis for the warrant.

In January 2004, a man complained to the Manchester Police Department that his boyfriend was being held against his will by Materas and Peter Deprisco at 374 Thornton Street.  He expressed his belief that Materas and Deprisco were supplying large

---

[1]  A defendant who believes that the police included false statements or material omissions in an affidavit underlying a search warrant may request an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

amounts of methamphetamine to dealers in Manchester, and eventually admitted that he had bought drugs from them in the past.

Six months later, another man told the Manchester Police Department that he had been held against his will at 454 Hanover Street in Manchester. He claimed that he had smoked what he believed to be methamphetamine with several people, including one named Keith. The police responded to the same address and identified "Keith" as Keith Materas.

In September 2004, the Manchester Police Department responded to a domestic dispute at 374 Thornton Street, where Materas and Deprisco identified themselves as co-owners and residents of that address.

During the same month, the New Hampshire Drug Task Force, of which Detective Bourgeois was a member, received information that an individual named Keith, a homosexual man who lived in Manchester, was the largest supplier of methamphetamine in the state. In an unrelated incident, the Nashua Police Department also learned from a cooperating individual in its custody that two men named Keith and Peter of 454 Hanover Street were selling methamphetamine.

On October 12, 2004, Detective Bourgeois arranged a controlled purchase of a small amount of methamphetamine by a confidential informant at 374 Thornton Street. The informant

entered the residence and returned with methamphetamine, which he claimed to have bought inside from Materas.

**B. The Search**

After the Manchester District Court issued the no-knock warrant on October 14, 2005, the police executed the warrant the same day, led by Detective Bourgeois. Ten to fifteen officers entered the residence with guns drawn[2] and proceeded directly toward the basement, where they believed Materas and Deprisco were residing while the upper floors of the residence were under construction. In fact, Materas did not reside at 374 Thornton Street; he had been living at 454 Hanover Street for more than three months prior to the application for the search warrant. Nonetheless, the officers found Materas and Deprisco standing in the hall, where they were apprehended and handcuffed. Materas maintains that he was under the influence of methamphetamine at the time of entry.

Detective Bourgeois proceeded into the basement, where he found Materas's dog. Materas claims that the detective threatened to shoot the dog if he did not keep him under control. Detective Bourgeois denied making such a threat, testifying that he put the dog in a closet in order to allow the officers to search the room.

---

[2] Detective Bourgeois's affidavit included information from a confidential informant that Deprisco possessed a firearm.

The officers then moved the two men into the basement, where Deprisco became uncooperative. After Deprisco was removed from the room, and while approximately six other officers searched the room, Detective Bourgeois told Materas, who was still handcuffed, that if he would tell them where the drugs were, it would save them from having to tear the place apart. Detective Bourgeois testified at trial that his intent was to make the process easier for everyone, given the clutter in the room and his belief that the drugs were there. Materas then indicated that the drugs were located in a clear plastic case behind Detective Bourgeois.

At some point, Detective Bourgeois searched Materas, and in the process asked him to undo his pants. Because he was not wearing underwear, his genitals were exposed for a brief period.

After the drugs were found, Materas was removed upstairs to the kitchen area, where he was read his Miranda rights and questioned further. Detective Bourgeois testified that Materas did not exhibit signs of being under the influence of any substance, although Materas did tell the detective that he was a methamphetamine addict, using one to two grams a day. No guns were drawn during Materas's interrogation.

Materas was cooperative and answered Bourgeois's questions, as well as those of a DEA agent also present. Materas stated that he received just under a pound of methamphetamine every

-5-

six to eight weeks, which he used and distributed to friends.  He admitted that most of the drugs found in the search were his.  Some of the drugs, however, he attributed to Deprisco, with whom he had lived at the 374 Thornton Street residence for twelve years.  He indicated that he and Deprisco had broken up, but were recently reunited.

Materas was then moved to the Manchester Police Department.  There, Detective Bourgeois read him his Miranda rights again, and asked Materas to sign a form waiving his rights, which he did.  Later, Detective Bourgeois relayed a message to Materas that his attorney had called and was trying to reach him.  Materas voluntarily signed another form waiving his rights and indicated that he wanted to continue to cooperate.  During his questioning at the police station, Materas reiterated the statements he had previously made after waiving his Miranda rights at the residence.

### C. Proceedings

On March 23, 2005, a federal grand jury returned a three-count indictment against Materas.  Count 1 charged Materas with distribution of methamphetamine, and Counts 2 and 3 charged him with possession with intent to distribute ecstasy and five or more grams of methamphetamine, respectively, all in violation of 21 U.S.C. § 841(a)(1).

On July 18, 2005, Materas filed a motion to suppress the statements he made during the search.  He asserted that he should

have been read his Miranda rights before being questioned on the location of the drugs and that he was interrogated under coercive circumstances while the police knew that he was under the influence of methamphetamine. Materas also filed a separate motion to suppress the evidence seized as a result of the search. He argued that the search was invalid because Detective Bourgeois failed to provide proof of his informant's credibility, which was undermined by the informant's failure to tell the police that Materas did not reside at 374 Thornton Street.

On August 19, 2005, the district court heard and denied both motions. The court ruled that the circumstances of the controlled buy at 374 Thornton Street constituted adequate probable cause to justify the search, whether or not the warrant contained other material omissions or false statements. The judge clarified at the defense's request that Materas was not entitled to a Franks hearing because even if he could prove everything that he claimed, it still would not be enough to support suppression.

With respect to Materas's statements subsequent to being read his Miranda rights, the court specifically determined that there was nothing "unusually coercive about the circumstances" surrounding Materas's waiver of his Miranda rights. It also concluded that Detective Bourgeois had acted "entirely in good faith" and that his initial question about the location of the drugs was not intended to undermine Materas's rights. The court

went on to note that Materas's intitial statement concerning the location of the drugs would be suppressed and that the government had no intention of using the statement in its principal case. Finally, the court deferred the determination of whether the statement could be used for impeachment purposes.

Following the denial of his motions to suppress, Materas changed his plea to guilty on the two counts of possession, reserving his right to appeal the court's suppression rulings. On May 24, 2006, the court dismissed Count 1 and sentenced Materas to seventy months imprisonment on each of Counts 2 and 3, to be served concurrently.

## II. Discussion

On appeal, Materas argues that the district court erred in imposing too high a burden for his preliminary showing that he was entitled to a Franks hearing. He further argues that the police coerced him into making his initial statement indicating where the drugs were located, and that suppression of only that initial statement, rather than all statements made to the police thereafter, is an inadequate remedy for the violation of his constitutional rights. After carefully considering Materas's arguments, we affirm the district court's denial of his motions to suppress.

## A. **Franks** Hearing

We review the denial of a <u>Franks</u> hearing for clear error. <u>United States</u> v. <u>Nelson-Rodríguez</u>, 319 F.3d 12, 34 (1st Cir. 2003). Under <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154, 155-56 (1978), a defendant may request an evidentiary hearing to challenge police misconduct in drafting an affidavit in support of a search warrant. The defendant "must make a 'substantial preliminary showing' that the affidavit included a false statement which was made either knowingly and intentionally or with reckless disregard for the truth, and that this misstatement was necessary to the finding of probable cause." <u>Nelson-Rodríguez</u>, 319 F.3d at 34 (quoting <u>Franks</u>, 438 U.S. at 155-56).

Materas first challenges the constitutionality of the standard set forth in <u>Franks</u>. He cursorily argues that this "overly burdensome requirement" essentially demands that the defendant prove his case before having an opportunity to obtain the testimony necessary to prove his case. We do not find the <u>Franks</u> standard particularly burdensome, and we note that the Supreme Court would not have announced an unconstitutional standard for challenging an affidavit in support of a search warrant when it decided the Fourth Amendment issue in <u>Franks</u>.

Materas then asserts that he made a sufficient showing to afford him a full <u>Franks</u> hearing. He argues that the police knew that he did not live at the address for which the search warrant

-9-

was issued, and that they purposefully misled the magistrate into issuing the warrant based on a non-existent nexus between the drugs sought and the location to be searched. See United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997) ("A nexus between the objects to be seized and the place to be searched for them is established when the circumstances set out in the affidavit would warrant a person of reasonable caution to believe that the articles sought would be found at the place to be searched.").

We, however, agree with the district court that an evidentiary hearing was not required. Even if Materas could prove that the police intentionally misrepresented that Materas lived at 374 Thornton Street, the affidavit describes a controlled buy that took place two days earlier at the same location involving Materas. The controlled buy from Materas alone provided sufficient probable cause for issuing the search warrant. Common sense dictates that evidence of Materas's possession could probably be found in the location where he sold drugs two days before. United States v. Ribeiro, 397 F.3d 43, 49 (1st Cir. 2005) ("[T]he application must give someone of 'reasonable caution' reason to believe that evidence of a crime will be found at the place to be searched."). In addition, the affidavit contained other information linking Materas to the address, even though he no longer lived there. Therefore, there was no error at all in the district court's

decision to deny the <u>Franks</u> hearing on the basis that probable cause existed independent of the alleged flaws in the affidavit.[3]

Finally, Materas claims that the district court imposed too high a burden on him by requiring him to show that suppression was warranted as a result of the alleged flaws in the affidavit. He bases his argument on the trial judge's statement at the suppression hearing that Materas had not shown "a sufficient basis to justify a conclusion that the evidence seized as a result of the warrant should be suppressed based on the warrant containing material omissions or material false statements." Our prior conclusion that the affidavit supported probable cause independent of the alleged flaws, however, renders this argument toothless. Regardless of the district court's language, it correctly determined that Materas was not entitled to a <u>Franks</u> hearing.

### B. Motion to Suppress Materas's Statements

We review the denial of a motion to suppress <u>de novo</u> as to questions of law, and for clear error as to questions of fact. <u>United States</u> v. <u>Vongkaysone</u>, 434 F.3d 68, 73 (1st Cir. 2006). We

---

[3] Materas also makes a cursory argument that "the affidavit's sole reliance on the information provided by a previously unproven confidential informant provided the magistrate with [an insufficient] basis upon which to make a determination as to the informant's credibility," citing <u>United States</u> v. <u>Barnard</u>, 299 F.3d 90, 93 (1st Cir. 2002) ("Where an affidavit relies on the reports of unnamed informants, it must provide some information upon which the issuing justice can assess the credibility of the informant's information."). As we stated above, however, the detective's own report on the controlled buy was sufficient to establish probable cause for the search warrant.

will uphold the district court's decision if "any reasonable view of the evidence supports the decision." United States v. Hawkins, 279 F.3d 83, 85 (1st Cir. 2002).

Under Miranda v. Arizona, 384 U.S. 436, 479 (1966), evidence obtained as a result of police interrogation prior to the defendant being read his "Miranda rights" cannot generally be used against the defendant in the prosecution's case in chief. The consequences of a Miranda violation, however, are limited. For instance, the Miranda rule is not subject to the "fruits of the poisonous tree" doctrine.[4] United States v. Patane, 542 U.S. 630, 642 (2004) (plurality opinion); see also Oregon v. Elstad, 470 U.S. 298, 307 (1985) ("[T]he Miranda presumption . . . does not require that the [unwarned] statements and their fruits be discarded as inherently tainted."). As another example, the prosecution can use uncompelled statements obtained without Miranda warnings for impeachment purposes. Elstad, 470 U.S. at 307-08 (citing Harris v. New York, 401 U.S. 222 (1971)).

No one disputes that Materas's initial statement regarding the location of the drugs was obtained in violation of Miranda. Although the government agreed not to use the statement, Materas argues that suppression of only that statement is not an

---

[4]  This doctrine requires the exclusion "not only [of] illegally obtained evidence itself, but also . . . other incriminating evidence derived from the primary evidence." Nix v. Williams, 467 U.S. 431, 441 (1984).

adequate remedy to redress the violation of his rights. He claims that use of the statement for impeachment purposes would deny a defense that he did not know the drugs were present. Further, he urges us to consider his entire interrogation as one ongoing event resulting from the hostile circumstances surrounding his initial statement, and asks us to suppress all statements made during that time. He describes his initial coercion as "turning on a spigot" that led to his continued confessions.

Materas's arguments are unpersuasive. As to Materas's second argument that all of his statements should be suppressed because of the coercive nature of his initial divulgement, the district court correctly limited the consequences of the Miranda violation to the one statement elicited prior to reading the defendant his rights. The district court found that there was nothing particularly coercive about the circumstances of the waiver of Materas's Miranda rights and that Detective Bourgeois acted in good faith. These factual findings are firmly grounded in the record and therefore not clearly erroneous.

Based on these findings, we agree with the district court that there is no evidence that the police were attempting to undermine the purposes of the Miranda rule to gain subsequent Mirandized confessions. See Missouri v. Seibert, 542 U.S. 600, 616 (2004). Other than asking where the drugs were located, the police did not ask any other questions before explaining to Materas his

rights in another location, fifteen minutes later. As the court found, "the first questioning was not at all systematic" or extensive. See id. at 615-16 (discussing a number of factors related to the effectiveness of Miranda warnings, including "the completeness and detail of the questions and answers in the first round of interrogation, . . . and the degree to which the interrogator's questions treated the second round as continuous with the first."). The district court believed that Materas understood his rights and voluntarily waived them, and therefore the court was justified in limiting the scope of the Miranda violation to its usual consequences, i.e., excluding only the pre-Miranda statement. See United States v. Esquilín, 208 F.3d 315, 319 (1st Cir.) ("A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily . . . suffice[s] to remove the conditions that precluded admission of the earlier statement." (internal quotation marks omitted) (quoting Elstad, 470 U.S. at 314)); see also Patane, 542 U.S. at 642 ("'[T]he exclusion of unwarned statements . . . is a complete and sufficient remedy' for any perceived Miranda violation." (quoting Chávez v. Martínez, 538 U.S. 760, 790 (2003) (Kennedy, J., concurring in part and dissenting in part))).

We also reject Materas's purely hypothetical argument that his initial statement should have been disallowed for impeachment purposes. Because Materas's subsequent Mirandized

-14-

statements would not have been suppressed, it would make no sense for Materas to have claimed any kind of lack of knowledge defense. After waiving his <u>Miranda</u> rights, he repeatedly admitted that the drugs seized during the search were his.  With this direct evidence, the government would have had no reason to use his initial statement for impeachment purposes.  Furthermore, we will not assist a defendant in using "[t]he shield provided by Miranda . . . [as] a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." <u>Harris</u>, 401 U.S. at 226.

### III. <u>Conclusion</u>

For the reasons stated above, we affirm the district court's denial of Materas's motions to suppress.

**<u>Affirmed</u>**.