**UNITED STATES of America**

v.

**Jimmy Roman ROSARIO, Defendant.**

**No. 09–cr–30007–MAP.**

United States District Court,
D. Massachusetts.

Sept. 8, 2011.

378

Paul H. Smyth, Todd E. Newhouse, U.S. Attorney's Office, Springfield, MA, for United States of America.

***MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR RECONSIDERATION & DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS*** (Dkt. Nos. 117 & 141)

MICHAEL A. PONSOR, Senior District Judge.

## I. *INTRODUCTION*

The indictment charges Defendant with one count of distribution and possession with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a). The cocaine was discovered during a search of Defendant's residence on August 17, 2006. Defendant now moves the court to reconsider its earlier denial of his motion to suppress the fruits

of that search (Dkt. No. 117) and to conduct further evidentiary hearings on the matter (Dkt. No. 141). The court will deny these motions for the reasons that follow.

## II. *FACTUAL BACKGROUND*

### A. *Negron's Arrest.*

In August 2006, a confidential informant ("CI") working for the Holyoke Police Department made two controlled purchases of crack cocaine from Eugenio Negron. The officers applied for, and obtained, state search warrants for 74 Newton Street and 121 Newton Street in Holyoke, Massachusetts. Investigators arranged a third controlled purchase between Negron and the CI on August 17, 2006, and planned to arrest Negron and execute the two search warrants when Negron delivered the crack to the CI. At approximately 5:15 p.m. that day, the CI called one of the officers involved and informed him that Negron needed to pick up the drugs from an undisclosed location.

The government asserts that at approximately 5:30 p.m., three officers—Detective Paul Barkyoumb and Task Force Agents Aurelio Garcia and Pablo Diaz—followed Negron in separate vehicles from 74 Newton Street to the State Street Tavern ("the Tavern") in Springfield. The officers allegedly observed Negron exit the Tavern with an individual known to Negron as "Fat Back" and later identified as Defendant Jimmy Roman Rosario. After leaving the Tavern, Negron drove a black SUV to Defendant's residence, located at 50 Putnam Circle in Springfield. Also accompanying Negron and Defendant during this trip was a man named Kelly Arzate.

According to Negron's testimony, when they arrived at 50 Putnam Circle, Negron handed Defendant $5,200 (half from Arzate and half from him) in exchange for two hundred grams of powder cocaine, which Defendant retrieved from his residence. (Dkt. No. 111, Tr. 1/04/11, 21:15–22:18.) Negron then drove Defendant back to the Tavern and dropped him off before continuing on to Newton Street in Holyoke. The government asserts that officers followed Negron during this entire trip, while Defendant contends that this surveillance never occurred.[1]

In any event, when Negron arrived at 74 Newton Street, he asked a friend to cook the powder cocaine into crack cocaine. (*Id.* 24:13–15.) Shortly thereafter, Negron exited the apartment with the crack cocaine and entered a Toyota Camry being driven by another individual. Officers followed that vehicle to a location several blocks away where Negron was expected to deliver the drugs to the CI. When the Camry stopped, officers attempted to block the car, at which point the driver turned the vehicle onto the sidewalk, and a short chase ensued. Negron jumped out of the moving car and was arrested at approximately 6:18 p.m.

Negron immediately agreed to cooperate and stated that he had cocaine hidden between the cheeks of his buttocks. An officer then searched his person and retrieved a plastic baggie containing what was later revealed to be fifty grams of crack cocaine. The arresting officers then transported Negron to the Holyoke police station, where he was debriefed. Contemporaneous with Negron's arrest, other law enforcement officers executed the search warrants for 74 Newton Street and 121 Newton Street, approximately ten blocks away, where they seized narcotics and made additional arrests.

### B. *Trooper Soto's Affidavit and the Search of 50 Putnam Circle.*

At the Holyoke police station, Negron was escorted to a debriefing room with

---

1. The court finds this dispute inconsequential, as explained below.

Trooper Daniel Soto and Detective Paul Barkyoumb. During this police interview, Trooper Soto sat at a desk, with Negron and Barkyoumb seated behind him, and typed up an affidavit in support of a warrant to search Defendant's address. According to the affidavit, Negron told the officers the following:

> [P]rior to being arrested he had bought fifty (50) grams of crack from a subject he knew only as 'Fat Back' from 50 Putnam Circle in Springfield, which corroborated what had been observed by the surveillance officers and learned by [Agent] Diaz. Negron further stated that Fat Back had told him he still had approximately one (1) kilo of crack cocaine back at his house, and that when he, Negron, asked about purchasing two hundred (2)[sic] more grams of crack cocaine later this same date, Fat Back told him that that would be no problem.

(Dkt. No. 76, Ex. B, Soto Aff. ¶ 8.)

Negron also stated "that he had been inside 50 Putnam Circle many times … to purchase crack cocaine" in the past year and a half, and that "during that time he [had] made several multi-ounce purchases, the largest being approximately three hundred (300) grams." (*Id.*) Trooper Soto's affidavit also detailed Negron's communications with the CI on August 17 regarding the sale of crack cocaine (*Id.* ¶ 5), the surveillance of Negron's vehicle to and from 50 Putnam Circle later that day (*Id.* ¶ 6), the events surrounding his subsequent arrest (*Id.* ¶ 3), and Negron's willingness "to be named in this affidavit and [to] testify in court if needed" (*Id.* ¶ 8). The affidavit further noted that, when shown a photograph of Defendant, Negron positively identified him as the individual named "Fat Back" who supplied him with the cocaine. (*Id.* ¶ 9).

With the aid of this affidavit, Trooper Soto applied for, and was granted, a search warrant for 50 Putnam Circle by a state clerk-magistrate at approximately 9:15 p.m. The search was executed shortly thereafter, resulting in Defendant's arrest. Police seized approximately 17.4 kilograms of powder cocaine from a closet in Defendant's bedroom, in addition to a loaded firearm, a scale, and a small sum of money.

### III. *PROCEDURAL BACKGROUND*

State criminal proceedings were originally brought in Hampden County Superior Court and later dismissed after Defendant successfully moved to suppress the evidence seized from 50 Putnam Circle. The Superior Court's holding rested entirely on state law and noted that "were this motion to be decided solely on Fourth Amendment standards, it would be denied." (Dkt. No. 76, Ex. 3, at 15.)

The government filed a federal indictment in this court in April 2009. On May 10, 2010, Defendant filed a motion to suppress statements he made to law enforcement officers following his arrest. (Dkt. No. 73.) He also moved to suppress the fruits of the search and requested a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). (Dkt. No. 76.) On July 26, 2010, after conducting a hearing on these motions, the court suppressed certain statements made at the time of Defendant's arrest and, somewhat reluctantly, allowed Defendant's request for a *Franks* hearing. The court noted that Defendant had just barely made the requisite threshold showing to justify an evidentiary hearing on the matter and ordered that the hearing would be limited to the content of Negron's statements following his arrest.

Now, more than a year later and after multiple hearings on the matter, this issue remains, to some extent, unresolved. On February 18, 2011, the court denied Defendant's motion to suppress based upon a *Franks* violation (Dkt. No. 76), in part

because Defendant's counsel at the time failed to file the requested supplemental memorandum, despite repeated extensions. Defendant now moves the court to reconsider this order, attaching the promised memorandum. (Dkt. No. 117.) Defendant also filed a supplemental motion asking the court to re-open the evidentiary hearing and presenting new arguments in support of the motion to suppress. (Dkt. No. 141.)

For reasons stated following oral argument, the court will deny the request for a new hearing. To summarize, the court has more than sufficient testimony and legal argument before it, including testimony from Trooper Daniel Soto, Trooper Michael Joslyn, Detective Paul Barkyoumb, Eugenio Negron, and Defendant. While both sides have requested an opportunity to expand the scope of the hearing, it is now clear that the original decision to limit the evidence to what occurred after Negron's arrest was correct.[2] Having also reconsidered Defendant's substantive arguments in support of his motion to suppress (Dkt. No. 117), as well as new arguments raised in his supplemental motion (Dkt. No. 141), the court remains unpersuaded and will deny these motions for the reasons that follow.

## IV. DISCUSSION

As a result of complications in this case that do not require elaboration here, Defendant, through various counsel at various points in time, submitted multiple memoranda in support of his motion to suppress. (See Dkt. Nos. 76, 127, 141, & 142.) Because Defendant's most recent filings in support of his supplemental motion (Dkt. Nos. 141 & 142) have a different focus than earlier memoranda, the court will segment its discussion accordingly.

### A. Defendant's Motion for Reconsideration (Dkt. No. 117).

Defendant argues that Trooper Soto's affidavit contained misleading statements and omissions, which, when stricken from the affidavit, preclude a finding of probable cause and demand suppression. This court disagrees.

 A "presumption of validity" exists with respect to affidavits drafted in support of a search warrant. *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). "For this reason, a defendant must meet a high bar even to get a *Franks* hearing in the first place." *United States v. Tzannos*, 460 F.3d 128, 136 (1st Cir.2006). The bar is higher to justify suppression:

> In order for a warrant to be voided and the fruits of the search excluded, the defendant must meet an even more exacting standard: he must (1) show that the affiant in fact made a false statement knowingly and intentionally, or with reckless disregard for the truth, (2) make this showing by a preponderance of the evidence, and (3) show in addition that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause."

*Id.* (quoting *Franks*, 438 U.S. at 156, 98 S.Ct. 2674).

#### 1. Alleged Misstatements and Omissions.

Here, Defendant alleges that the affiant, Trooper Soto, made the following misstatements to the state clerk magistrate: (1) that Negron was willing to be named; (2) that Negron said that he bought "crack" from Fat Back; (3) that Fat Back still had

---

**2.** The parties vigorously dispute the evidence relating to the surveillance of Negron's vehicle as it traveled to the State Street Tavern, then on to 50 Putnam Circle, and back to the

Tavern before finally returning to Holyoke. As explained below, this evidence is ultimately inconsequential and, as such, does not merit any further attention.

one kilogram of cocaine at his house; and (4) that Negron had been inside 50 Putnam Circle many times before. Defendant also asserts that Trooper Soto's affidavit omitted important information concerning Negron's criminal record and the nature and timing of Defendant's prior narcotics sales. The court will address each of these allegations in turn.

Defendant first asserts that Trooper Soto falsely reported that Negron was willing "to be named in this affidavit and [to] testify in court if needed." (Dkt. No. 76, Ex. B, Soto Aff. ¶ 8.) In support, Defendant points to the following testimony by Negron: "I just [asked] them is anybody going to find out that it's me? No. And he just said your name won't be brought out there. It won't be put out there." (Dkt. No. 111, Tr. 1/4/11, 65:23–25.) As this excerpt indicates, Negron's testimony was somewhat ambiguous on this point. Negron later tried to explain:

[Trooper Soto told me that] he has to do it but he just told me that my name won't be out there. That's all he told me. He never specifically said don't worry, nobody is going to find out. This is sealed. He didn't say none of that. He just—I know he put my name on it. I read it. I see my name. He just basically told me my name won't be out there. That's all.

(Dkt. No. 111, Tr. 1/4/11, 68:4–10.) Although this testimony is less than perfectly clear, it appears that Negron realized that Trooper Soto would be including his name in the affidavit, and he further understood that he could be called to testify as a witness if the case went to trial. (*Id.* at 67:12–16.) At the same time, though, Negron wanted assurance that his name "won't be out there," which he failed to elaborate on. (*Id.* at 68:17–19.) This vague statement in no way undermines Trooper Soto's assertion in his affidavit, and, consequently, this court sees no reason to excise it.

Defendant next highlights the following alleged misstatement: "Negron then stated that prior to being arrested he had bought fifty (50) grams of crack from a subject he knew only as 'Fat Back' from 50 Putnam Circle in Springfield...." (Dkt. No. 76, Ex. B, Soto Aff. ¶ 8.) Defendant notes that at the hearing Negron testified that he received powder cocaine from Fat Back, which his friend later turned into crack cocaine when he arrived in Holyoke. (Dkt. No. 111, Tr. 1/04/11, 24:13–15.) Trooper Soto testified that Negron never told him he received powder cocaine: "Your Honor, I believe he said crack cocaine. If he would have said powder cocaine, I would have put that in my affidavit." (Dkt. No. 110, Tr. 1/4/11, 30.) However, Negron clarified the situation as follows:

[Trooper Soto and Detective Barkyoumb] didn't ask me directly either powder or crack cocaine. They didn't tell me anything like that.... The thing got turned into crack, but, like I say again, he didn't ask me whether it was crack or powder. They just [asked] me where did you get the drugs from, that was it.... He just said drugs.

(*Id.* 35:18–36:15.)

According to Negron's testimony, Trooper Soto asked where Negron had purchased the "drugs" from, and Negron told him. Defendant charges that "Soto was at least reckless" in failing to inquire further. (Dkt. No. 127, Def.'s Mem. Supp. Mot. Reconsider at 17.) While it is true that follow-up questions by Trooper Soto might have corrected this error, under these circumstances his "failure to probe further does not amount to reckless disregard." *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir.2002). Because crack cocaine was seized from Negron's person, Trooper Soto reasonably, albeit incorrectly, assumed that the substance Negron

purchased was crack cocaine. In addition, Negron effectively (if unintentionally) confirmed this information by failing to catch the inconsistency when Trooper Soto gave him the opportunity to read and amend the affidavit. (Dkt. No. 111, Tr. 1/4/11, 41:14–24.)

Even assuming *arguendo* that Negron intentionally lied to Trooper Soto about receiving crack cocaine from Fat Back (and perjured himself before the court), it matters little. Trooper Soto had no reason to believe that Negron was lying about the kind of drugs he received, and, more importantly, there is no evidence to suggest that Trooper Soto "in fact entertained serious doubts as to the truth" of the allegations. *Ranney,* 298 F.3d at 78 (quoting *United States v. Williams,* 737 F.2d 594, 602 (7th Cir.1984)).

■ The same is true of the assertions "that Fat Back had told [Negron] he still had approximately one (1) kilo of crack cocaine back at his house" and "that he had been inside 50 Putnam Circle many times ... to purchase crack cocaine." (Dkt. No. 76, Ex. B, Soto Aff. ¶ 8.) As Defendant observes, Negron later acknowledged that although he made these statements, they were false.

Q. Did Fat Back tell you that he had a kilo of cocaine in the house still?

A. No, he did not.

Q. And did you tell Trooper Soto on August 17, 2006 that you had spoken to Fat Back about buying more drugs that day?

A. Yes.

Q. What did you tell Trooper Soto about your conversation with Fat Back about buying more drugs on August 17, 2006?

A. I told the officer that he just basically told me that if I needed anything, to just call him. That he was ready.

Q. And is that the truth? Did Fat Back tell you that?

A. Yes.

(Dkt. No. 111, 1/4/11, 28:10–24.) As to his familiarity with 50 Putnam Circle, Negron testified:

Q. Now, had you ever—on August 17, 2006 had you ever been inside of 50 Putnam Circle?

A. No, I haven't.

Q. Did you tell Trooper Soto on August 17th of 2006 that you had been inside 50 Putnam Circle?

A. Yes, I did.

Q. Was that the truth?

A. No.

Q. Why did you tell him that?

A. I was just trying to help myself and they were just trying to wonder if I ended coming from that location getting the drugs from there.

(Dkt. No. 111, 1/4/11, 27:18–28:4.)

■ Defendant argues that such egregious misstatements must be excised from Trooper Soto's affidavit. However, while Negron's explanation ("I was just trying to help myself") is troubling, the fact remains that these intentional false statements were made by the informant, *not* the affiant.

> Ultimately, [the defendant] must demonstrate, by a preponderance of the evidence, that the affiant ... rather than the informant, made a false statement knowingly and intentionally, or with reckless disregard for the truth.

*United States v. Tzannos,* 460 F.3d 128, 138 (1st Cir.2006). Thus, alleging merely that the informant relayed misinformation to the affiant is insufficient. *See id.; see also Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ("The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant."). Again, given the circumstances, there was no rea-

son for Trooper Soto to doubt the veracity of these statements, and certainly no evidence suggests that he actually harbored such doubts.

■ Defendant also asserts that Trooper Soto's affidavit contained a number of omissions concerning Negron's full criminal record, the fact that he was a gang member, and the nature and timing of Defendant's prior drug deals. Specifically, Defendant notes that (1) while the affidavit described Negron as "a major supplier of cocaine and crack cocaine in the City of Holyoke" it failed to detail his numerous drug-related offenses; (2) the affidavit omitted Negron's gang affiliation; (3) the affidavit referred to Defendant as "a known drug supplier from whom [law enforcement] had made several CI buys" but failed to note that the three prior deals involved powder cocaine, not crack cocaine; and (4) the prior deals occurred almost a year earlier at a pub, not Defendant's residence.[3] (Dkt. No. 127, Def.'s Mem. Supp. Mot. Recon. at 9–10.) Defendant contends that the omission of these facts was reckless.

■ "Recklessness may be inferred when omitted information was 'clearly critical' to assessing the legality of the search." *United States v. Vigeant,* 176 F.3d 565, 569 (1st Cir.1999) (quoting *United States v. Reilly,* 76 F.3d 1271, 1280 (2d Cir.1996)). Here, the alleged omissions have little value and, to some extent, support a finding of probable cause. Defendant fails to explain the pressing need to include Negron's gang affiliation and to provide his extended rap sheet, as opposed to simply labeling him "a major supplier of cocaine and crack cocaine in the City of Holyoke." (Dkt. No. 76, Ex. B, Soto Aff. ¶ 4.) At best, these facts have only margin-

al relevance, and are not "clearly critical to assessing the legality of the search." *Id.*

As for Defendant's prior drug sales, this information cuts both ways. On the one hand, Defendant points out inconsistencies between his prior deals (*e.g.,* involving powder cocaine) and the events described in the affidavit. On the other hand, Trooper Soto's vague and unsubstantiated description of Defendant as "a known drug supplier from whom [law enforcement] had made several CI buys" does little to support a finding of probable cause. If, as Defendant urges, Trooper Soto had explained that Defendant was "a known drug supplier from whom they had made three confidential informant buys of $50 worth of powdered cocaine at the Cornerstone Bar in Springfield, Massachusetts on September 16, 2005, September 23, 2005, and October 7, 2005," (Dkt. No. 127, Def.'s Mem. Supp. Mot. Reconsider at 16), a finding of probable cause would arguably be strengthened, given the specificity of this information. Moreover, this information is more relevant than Defendant suggests, as it shows that Defendant was observed selling cocaine on three prior occasions within the past year in the city of Springfield.

Finally, to the extent that these facts undercut a probable cause finding in any way, it is unclear which, if any, of these facts Trooper Soto was aware of when he drafted the affidavit, and, again, his "failure to probe further does not amount to reckless disregard." *United States v. Ranney,* 298 F.3d 74, 78 (1st Cir.2002).

In sum, the court concludes that any arguable misstatements or omissions in Trooper Soto's affidavit were not made knowingly, intentionally, or with reckless disregard for the truth. Consequently, the

---

**3.** Defendant also notes that Trooper Soto omitted the fact that another individual, Kelly Arzate, accompanied Negron and Fat Back to 50 Putnam Circle. However, he does not argue that this fact is material in any way, nor does he contend that Trooper Soto was aware of this fact.

court will not excise them from the affidavit. Moreover, even if the court had reached the opposite conclusion, the result here would be the same, as sufficient probable cause existed with or without the statements identified. The court now turns to this issue.

### 2. *Probable Cause.*

 Probable cause to conduct a search exists if "the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). A warrant application must demonstrate probable cause to believe that "(1) a crime has been committed (the 'commission' element), and (2) enumerated evidence of the offense will be found at the place to be searched (the 'nexus' element)." *United States v. Strother,* 318 F.3d 64, 67 (1st Cir.2003). When assessing nexus, the issuing judicial officer must:

> make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A reviewing court's duty "is simply to ensure that the magistrate had a substantial basis for ... concluding that probable cause existed." *Id.* at 238–39, 103 S.Ct. 2317 (citation and internal quotation marks omitted).

 The probable cause inquiry requires courts to consider "the totality of the circumstances." *Strother,* 318 F.3d at 67 (quoting *United States v. Khounsavanh,* 113 F.3d 279, 285 (1st Cir.1997)). Relevant factors include:

> whether an affidavit supports the probable veracity or basis of knowledge of

persons supplying hearsay information; whether informant statements are self-authenticating; whether some or all [of] the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and whether a law-enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience or expertise.

*Id.* (quoting *Khounsavanh,* 113 F.3d at 284). An informant's "veracity, reliability, and basis of knowledge" are "highly relevant" to this determination. *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (quoting *Gates,* 462 U.S. at 230, 103 S.Ct. 2317). Still, none of these factors is dispositive, and, thus, "stronger evidence on one or more factors may compensate for a weaker or deficient showing on another." *Strother,* 318 F.3d at 67 (quoting *Khounsavanh,* 113 F.3d at 284).

 Trooper Soto's affidavit easily satisfies the above requirements; the totality of the circumstances described in that document established more than "a fair probability" that contraband would be found at 50 Putnam Circle. *Gates,* 462 U.S. at 238, 103 S.Ct. 2317. The following six factors strengthen Negron's veracity, reliability, and basis of knowledge: (1) he provided the officers with a detailed account of a recent drug transaction; (2) his account was based on first-hand observations; (3) his account included several statements against his penal interest; (4) he positively identified Defendant as the person he knew as "Fat Back"; (5) he was willing to be named; and (6) the officers corroborated some significant details of the information provided. The court will address each of these in turn.

First, the affidavit contained a lengthy and detailed description of a drug transac-

tion that had occurred only hours earlier. Trooper Soto began by describing Negron's arrest, then noted that Negron was known as a "major supplier of cocaine" in the city of Holyoke, and stated that Negron had had multiple conversations with a confidential informant about the sale of drugs just prior to his arrest. (Dkt. No. 76, Ex. B, Soto Aff. ¶¶ 4–5.) Trooper Soto then offered an extended narrative of Negron's trip from Holyoke to Springfield, where the transaction allegedly took place, and back to Holyoke:

> At approximately 5:30 p.m., Negron [left] 74 Newton Street and [entered] a black GMC Suburban with blue artwork on the side, MA registration 45AE64. At that time, he [traveled] to Springfield, specifically to the State Street Bar on the corner of Walnut and State Street where he picked up an unknown Hispanic male (UHM). Negron and the UHM then drove directly to 50 Putnam Circle where Negron parked his vehicle. The UHM then exited Negron's vehicle and entered that address, while Negron, himself, waited outside in his vehicle. A short time later, the UHM left that address and got into Negron's vehicle, after which Negron drove back to the State Street Bar. Once there, the UHM exited Negron's vehicle and returned to the bar, and Negron returned to Holyoke. On his way back to Holyoke, Negron telephoned the CI and stated that he had the stuff the CI was looking for, but that before he could meet with the CI he first had to make one stop.

(*Id.* ¶ 6.) The affidavit further stated that, while at 50 Putnam Circle, Negron and Defendant had exchanged money for drugs. (*Id.* ¶ 8.)

Negron testified that he remembers discussing the foregoing events with Trooper Soto and that he remembers being given the opportunity to review that information before it was included in the affidavit.[4] (Dkt. No. 111, Tr. 1/4/11, 17:15–24:4; 34:4–35:9.) He confirmed the affidavit's recitation of these events at the time of his interview and again in court. (*Id.*) The high level of specificity and detail contained in Trooper Soto's affidavit supports a finding of probable cause. *See United States v. Taylor*, 985 F.2d 3, 5 (1st Cir. 1993) (noting that affidavit may support informant's veracity "through the very specificity and detail" of the informant's description).

Second, the fact that Negron was detailing a transaction he was personally involved in adds considerable weight to his assertions. To begin with, all else being equal, a first-hand account is presumptively more reliable than a statement premised on hearsay. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."); *see also United States v. Cochrane*, 896 F.2d 635, 641 (1st Cir.1990) ("[A]n important indicia of reliability is the

---

4. This description also included assertions that "[Negron] was followed by the surveillance officers to Springfield," and "Negron was followed the entire time by the surveillance officers," (Dkt. No. 76, Ex. B, Soto Aff. ¶ 6), but, for purposes of this memorandum, the court will disregard such references. The parties vigorously dispute the scope of the surveillance and even whether the surveil-

lance occurred at all. Given the delays in this case and given the other indicia of reliability discussed in text, the court need not consider the earlier surveillance evidence in its probable cause analysis. Instead, the court will assume that Negron himself merely relayed the information contained in Paragraph Six to the officers.

fact that the informant's knowledge was based upon personal observation rather than hearsay.").

█ Third, Negron's first-hand account was highly self-incriminating. In addition to the transaction earlier that evening, Negron also admitted to making "several multi-ounce purchases, the largest being approximately three hundred (300) grams" at 50 Putnam Circle in the last year and a half. (Dkt. No. 76, Ex. B, Soto Aff. ¶ 8.) These statements against penal interest bolster an informant's credibility.

> Admissions of crime . . . carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search. That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct.

*United States v. Harris*, 403 U.S. 573, 583–84, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *see also United States v. Schaefer*, 87 F.3d 562, 566 (1st Cir.1996) ("The fact that an informant's statements are against his or her penal interest adds credibility to the informant's report.").[5]

Fourth, Defendant positively identified Defendant as the person he knew as "Fat Back." (Dkt. No. 76, Ex. B, Soto Aff. ¶ 9) ("I then showed Negron a Registry of Motor Vehicles photo of Jimmy Roman–Rosario . . . and Negron positively identified him as being the person he knows as "Fat Back" who supplies him with crack-cocaine.")

Fifth, Negron was a named informant who provided an in-person narrative to the officers. It is true, as Defendant notes, that Negron's reliability was dimin-

ished by the fact that he was not simply a "concerned citizen[ ] reporting potential criminal activity, whose stories may be more easily accepted than those of confidential informants whose motivations make their stories more suspect." *United States v. Croto*, 570 F.3d 11, 14 (1st Cir. 2009). Without question, Negron fits more comfortably into the latter category. However, Negron was also not in the same position as an anonymous tipster or an unnamed informant. The police knew his identity, "which in itself bolsters [his] credibility because it opens [him] up for charges related to making a false report." *Id.* Moreover, the face-to-face encounter gave Trooper Soto "the opportunity to perceive and evaluate personally [the] informant's mannerisms, expressions, and tone of voice (and, thus, to assess the informant's veracity . . .)." *United States v. Romain*, 393 F.3d 63, 73 (1st Cir.2004).

Sixth, and finally, Trooper Soto was able to corroborate two key pieces of information. After describing his own extensive experience in the field, specifically in narcotics investigations, Trooper Soto confirmed that Defendant was "a known drug supplier from whom [law enforcement] had made several CI buys." (Dkt. No. 76, Ex. B, Soto Aff. ¶ 4.) "An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination." *See United States v. Taylor*, 985 F.2d 3, 6 (1st Cir.1993). Additionally, he confirmed that Defendant did, in fact, reside at 50 Putnam Circle in Springfield. (Dkt. No. 76, Ex. B, Soto Aff. ¶ 9.)

In sum, while acting as a named informant, Defendant provided a detailed, first-

---

5. As Defendant correctly observes, not all statements against penal interest necessarily bolster the declarant's credibility. (Dkt. No. 127, Def.'s Mem. Supp. Mot. Reconsider at 29–32.) For instance, where an individual attempts "to shift blame or downplay his own role," his credibility remains suspect. *Wil-*liamson v. United States, 512 U.S. 594, 608, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (Ginsburg, J., concurring). Such is not the case here, where Negron admitted to making several large purchases from Defendant, without attempting to minimize his role in any way.

hand account of a drug transaction he was just involved in, as well as other prior transactions. He positively identified Defendant as his drug supplier, and Trooper Soto confirmed both that Defendant was a known cocaine distributor and that he resided at 50 Putnam Circle.

Defendant contends that the government is unable to satisfy the "nexus" element of the probable cause analysis, but this issue is not close. The affidavit described a drug transaction occurring in and around Defendant's residence just hours before the warrant was granted. Once Negron's reliability was established, this information alone was sufficient to satisfy the nexus criterion. *See United States v. Materas*, 483 F.3d 27, 32 (1st Cir.2007) ("Common sense dictates that evidence ... could probably be found in the location where he sold drugs two days before."). Moreover, Negron also informed Trooper Soto (albeit incorrectly) that Fat Back had told him he had a "kilo" at his house in case Negron needed more drugs, thus establishing a clear nexus to 50 Putnam Circle. Even if the court replaced this statement with Negron's corrected statement—that Fat Back told Negron he was "ready" to supply more drugs upon request—the analysis would be unchanged, as the weight of the drugs makes no difference. (Dkt. No. 111, 1/4/11, 28.)

Similarly, replacing the sentence "Negron then stated that ... he had bought the fifty (50) grams of crack from ... 'Fat Back'," (Dkt. No. 76, Ex. B, Soto Aff. ¶ 8), with "Negron then stated that he had bought powder cocaine from Fat Back, which he later cooked into crack cocaine" would not undermine the probable cause finding in any way. For the probable cause analysis, it is irrelevant whether the drugs were in the form of powder cocaine or crack cocaine, just as it is irrelevant whether Fat Back still had a kilogram or some undefined quantity of drugs.[6]

Thus, even though this court has decided not to excise or amend such statements, it is apparent that probable cause existed regardless. All that matters here is whether the magistrate had a substantial basis for concluding that there was a "fair probability" that contraband would be found in Defendant's residence. *Gates*, 462 U.S. at 238, 103 S.Ct. 2317. In the end, this case presents a scenario that is so simple and common as to be classic: Dealer (Negron) is caught red-handed and immediately agrees to reveal the identity of Supplier (Defendant) and the location of the transaction (Putnam Circle). Dealer positively identifies Supplier in a photograph, and the officers then confirm that the individual identified resides at the address given and is a "known drug supplier" in the area. Even disregarding the contested evidence of prior surveillance, probable cause is glaringly obvious.[7]

### B. *Defendant's Supplemental Motion to Suppress Evidence and Request for an Evidentiary Hearing (Dkt. No. 141).*

Defendant's supplemental motion to suppress takes a substantially different ap-

---

6. For the sake of completeness, the court will also point out that the same is true of Negron's false statement about having been inside 50 Putnam Circle on many prior occasions. Because he did not tell Trooper Soto that he observed drugs inside Defendant's residence, it does not matter whether Negron ever entered the house or simply consummated the sale in Defendant's driveway after the drugs were retrieved from inside.

7. Because the court finds that the information contained in Trooper Soto's affidavit overwhelmingly establishes probable cause, the court need not consider *Leon's* good-faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

proach, and, as a result, the court will address it separately. This motion ceases to focus on the *Franks* issue and instead asserts that "egregious police misconduct" justifies suppressing the fruits of the search in this case. (Dkt. No. 141, Def.'s Supp. Mot. at 2; Dkt. No. 142, Def.'s Supp. Mem. at 16.)

Defendant argues, citing *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), that "such outrageous police misconduct shocks the conscience" and "necessitates judicial intervention." (Dkt. No. 142, Def.'s Supp. Mem. at 16.) During oral argument, defense counsel characterized the underlying events in this case as a "web of deception." Defendant asserts that this misconduct is so extreme that it precludes the government from relying on *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) to argue that the police acted in good faith in relying upon the issuance of the search warrant. (*Id.* at 19–21.)

 However, the alleged misconduct highlighted by Defendant here does not approach the kind of outrageous behavior proscribed by *Rochin* and its progeny. *See Rochin*, 342 U.S. at 166, 72 S.Ct. 205 (suppressing evidence where police forcibly attempted to remove drugs defendant swallowed and, to that end, directed a doctor to pump his stomach against his will). Here, Defendant's supplemental motion focuses on actions taken by Detective Paul Barkyoumb. This is unsurprising given the former detective's recent, independent, and heavily publicized difficulties with the law himself. *See* Jeanette DeForge, *Holyoke Police Detective Paul Barkyoumb could face charges from Connecticut State Police*, The Republican, (Oct. 5, 2009) (noting that Barkyoumb was target of internal investigation and was determined to be "absolutely corrupt" by a Connecticut judge); Jeanette DeForge, *Paul Barkyoumb, former Holyoke police officer, arrested in drug investigation*, The Republican, (July 24, 2011) (describing Barkyoumb's latest arrest). Moreover, following an earlier suppression hearing in state court, the presiding judge noted that Detective Barkyoumb had "demonstrated an unhesitating willingness to offer false testimony before the Court." (Dkt. No. 76, Ex. 3 at 10.)

The central problem with Defendant's argument is that Detective Barkyoumb had little involvement in the search at issue here, and his evidence has no bearing on the court's finding that probable cause was well supported in the record before the issuing clerk magistrate. While he was present during Negron's arrest and subsequent interview, Detective Barkyoumb did not author the affidavit in support of the search of 50 Putnam Circle. Defendant goes to great lengths to persuade this court that Detective Barkyoumb misrepresented information in a separate affidavit (in support of a warrant for the Newton Street search), but he fails to explain how this misinformation infected the Putnam Circle search warrant. The same is true of the alleged inaccuracies contained in the police report describing Negron's arrest.

The only misconduct attributed to Trooper Soto is that "[i]nexplicably, Trooper Soto later destroyed all of his notes taken during the joint interrogation of Negron by himself and Barkyoumb." (Dkt. No. 142, Def.'s Supp. Mem. at 8.) Yet, Trooper Soto's testimony illustrates that his actions were far more innocuous and commonplace than Defendant suggests:

> THE COURT: .... Were you leaping right to preparing the affidavit as you were talking to [Negron], or were you typing down some preliminary things that you would later use to incorporate into the affidavit?

THE WITNESS: That's correct. It was a quick report you know what had occurred and then I started with the questions and answers. After listening to his summary, I started the questions and answers.

Q. (By Ms. Fried) Okay. Well, let me just follow up because I think His Honor knows what I'm trying to get at here. Exhibit 1, correct—

A. Yes.

Q.—your affidavit in support of the search warrant was created by you in pieces, right? In other words, you talked to one witness and you got some information. You talked to somebody else and you got some other information. You numbered all the paragraphs, decided what sequence to put them in, and turned it into this document which you then swore to and submitted to a judge or magistrate, right?

A. Now it's clear, yes, ma'am.

Q. Is that right?

A. That's right.

(Dkt. No. 110, Tr. 1/4/11, 40:24–41:22.) This testimony makes it clear that Trooper Soto was typing as Negron spoke and later reformatted the document as a structured, comprehensible affidavit, rather than a jumbled narrative. His failure to save Negron's narrative as one document and then save the finished product as a separate document is, at worst, an insignificant oversight, and certainly does not constitute outrageous police misconduct. Thus, because the misconduct alleged by Defendant was either trivial or unrelated to the search of 50 Putnam Circle, this court will not suppress the fruits of that search.

## V. *CONCLUSION*

For the foregoing reasons, Defendant's Motion for Reconsideration (Dkt. No. 117) and Supplemental Motion to Suppress and Request for an Evidentiary Hearing (Dkt. No. 141) are hereby DENIED.

It is So Ordered.